ROBERT A. CHAISSON, Judge.
12Pefendant, Willie J. Gross, Jr., appeals his convictions of second degree murder and armed robbery. For the reasons that follow, we affirm defendant’s convictions and sentences. We also deny his writ application that was consolidated with this appeal and his motions that were referred to the merits of this appeal.

STATEMENT OF THE CASE

On February 10, 2011, the Jefferson Parish Grand Jury returned an indictment *1176 charging defendant with second degree murder, in violation of LSA-R.S. 14:30.1 (count 1), and armed robbery while armed with a firearm, in violation of LSA-R.S. 14:64 and 14:64.3 (count two).[1] At his February 11, 2011 arraignment, defendant pled not guilty. The matter proceeded to trial before a twelve-person jury on November 15, 16, and 17, 2011. After considering the evidence presented, the jury found defendant guilty of second degree murder and armed robbery. On December 9, 2011, the trial judge sentenced defendant to the |smandatory term of life imprisonment without benefit of parole, probation, or suspension of sentence on the second degree murder conviction and to imprisonment at hard labor for forty-five years on the armed robbery conviction, to run concurrently. Defendant now appeals.

FACTS

On November 2, 2007, Marie Abreu was alone in the Metairie apartment that she shared with her boyfriend, Javier Sanchez, when she heard a knock on the door. When she opened the door, a man said something in English about a Mustang and calling the police. Ms. Abreu, who was Hispanic, did not understand what he was saying, so she closed the door and retrieved her car keys and cell phone. She went back to the door and opened it, and when she did so, three men with handguns were standing there. Upon seeing this, Ms. Abreu yelled. The men pointed their guns at her and told her to be quiet and go inside the apartment.
The men sat her on the sofa and started to look for something. Two men went upstairs, and one man stayed downstairs and stood by the door with a gun in his hand. They told Ms. Abreu that they were looking for two kilos of cocaine and asked her where her boyfriend was. She said she did not know, even though she knew Mr. Sanchez was returning movies and going to Popeye’s to get something to eat. At some point during this invasion, two of the men took her upstairs to search for the two kilos and some money.
While the men were searching, Ms. Abreu tried to call 911 and Mr. Sanchez, but the calls did not go through. One of the men took her phone away and they then tied her to the bed with gray duct tape and also taped her mouth shut. Eventually, defendant removed the tape, which was irritating her skin, and tied her up with a telephone cord and a belt. According to Ms. Abreu, the men took $9,500.00 that they found in a briefcase, as well as some jewelry worth $3,000.00.
14At some point, Ms. Abreu heard Mr. Sanchez’s car alarm. She then heard him enter the apartment and say that she had a bad habit of not answering the phone. Shortly thereafter, Ms. Abreu heard something like a bottle or a glass fall onto the floor, and the men then left the apartment. Ms. Abreu managed to get to the window, at which point she saw them get into Mr. Sanchez’s black Ford Expedition. Ms. Abreu explained that she saw Mr. Sanchez in the back seat with one man on each side of him and someone in the driver’s seat. After the Expedition drove off, she untied her legs and went to find help.
Ms. Abreu got into her Mustang and went to Bud’s Broiler, where she worked, and then by the house of Mr. Sanchez’s *1177 good friend, Rene Izaguirre, on Harvard Street. She blew the horn when she got to Mr. Izaguirre’s house; however, no one came outside. She went back to Bud’s Broiler because she knew a police officer would be there. Ms. Abreu told the officer what happened, but he did not understand her. She went back to her apartment, and when she did so, she saw “the truck where the suspects were,” but she did not see the Expedition.
Ms. Abreu went into her apartment, picked up her dog and some clothes, closed the door, and left. Afterward, she got into her Mustang and went back to Bud’s Broiler and met with Deputy Christopher Bassil of the Jefferson Parish Sheriffs Office. According to Deputy Bassil, Ms. Abreu seemed frightened and panicked, and her wrists were red. The officer accompanied Ms. Abreu back to her apartment. When they arrived, the pickup truck was not there, but the door to her apartment was open.
As Deputy Bassil entered the apartment, he saw Popeye’s chicken on the floor in the doorway as if someone had dropped it, and a soft drink spewed across the floor. He thought the rest of the apartment looked ransacked, as if someone had been looking for something. Deputy Bassil contacted his supervisor to request 15a translator. Once the Spanish interpreter arrived at the scene, Ms. Abreu explained what happened earlier that evening. She described the suspects as three black males between the ages of thirty and thirty-five years old, and she provided body type and clothing descriptions of each. After hearing her story, Deputy Bassil contacted the detective bureau and crime scene technicians.
Detective Frank Renaudin of the Jefferson Parish Sheriffs Office arrived at the scene and took control of the investigation. Detective Renaudin spoke to Ms. Abreu who was “terrified” and “hysterical.” Ms. Abreu informed the detective of what had occurred and thereafter gave her consent to search the apartment. As a result of the search, the officers recovered drug paraphernalia and white powdery residue from the apartment. In addition, the officers recovered duct tape from the bed and obtained as evidence a fingerprint from the tape. Detective Renaudin thereafter attempted to locate Mr. Sanchez through his cell phones which were also taken by the perpetrators. However, his attempts were unsuccessful.
That same evening, shortly before midnight, Mr. Sanchez’s body was discovered on the side of the road at the 1-510 exit in New Orleans East.[2] Detective Kevin Burns of the New Orleans Police Department arrived at the scene and recovered two spent 9 mm bullet casings and a receipt from Popeye’s that showed a time of 8:39 p.m. Surveillance video from Popeye’s showed that Mr. Sanchez went through the drive-through alone at that time in a dark-colored or black SUV.
Over the next few days, Detective Re-naudin continued his investigation and took additional statements from Ms. Abreu. In the meantime, the fingerprint obtained from the duct tape had been analyzed and was positively identified as belonging to co-defendant Calvin King. Thereafter, Detective Renaudin prepared *1178 |6a photographic lineup and presented it to Ms. Abreu who positively identified King as one of the assailants in the apartment. Detective Renaudin was subsequently provided with information from another law enforcement agency that defendant fit the description of one of the suspects and had close ties to King. Detective Renaudin thereafter prepared a photographic lineup which was presented to Ms. Abreu. She positively identified defendant as another assailant in the apartment on the night in question. Also, additional fingerprints were recovered from a box of liquor in the apartment, and they were positively identified as belonging to defendant.
Based on these positive identifications, Detective Renaudin obtained arrest warrants for King and defendant. King was located and arrested, and the officers then focused on finding defendant. On December 4, 2007, defendant was arrested after a traffic stop in Chamber’s County, Texas. The next day, Detective Renaudin and Sergeant Troy Bradberry drove to Texas to get defendant. Once they arrived back in Jefferson Parish, defendant, after being advised of his rights and waiving them, gave a taped statement that was played for the jury at trial.
In his statement, defendant said Calvin King contacted him to tell him that a shipment of cocaine had come in and that he wanted defendant to go with him and his cousin, Ben. On November 2, 2007, King and Ben met defendant at defendant’s relative’s house on Francis Drive in New Orleans East. They then drove to the victim’s apartment. Once there, King and Ben waited behind a wall while defendant knocked on the door. According to defendant’s statement, a lady opened the door and defendant told her he hit her car. When she came outside, King and Ben, armed with guns, came from behind the wall and escorted her back into the apartment. Defendant pulled the truck to the back and then entered the house. The perpetrators searched the house looking for money and drugs. At |7some point, King took the lady upstairs and taped her to the bedposts with duct tape because she would not be quiet. When defendant went upstairs, the lady was crying and complaining that her blood was being cut off by the tape. Defendant then cut the tape off of her and tied her up loosely with a belt and an extension cord. As they were searching, he heard Ben, who was downstairs, holler out, “He in here. I got him.”
King and defendant went downstairs, and King asked the victim, Javier, where the “dope” was. Although Javier said he did not know at first, he eventually told King that the drugs were at Harvard Street. King and Ben, who had guns, put Javier in the Expedition. Defendant then got into the other truck and followed the Expedition to the house on Harvard Street. Another Hispanic guy was in the driveway of the house on Harvard Street, so they left. King said, “Let’s go. We going take care of this business.”
In defendant’s statement, he claimed that he followed them to New Orleans East, exited on Downman Road, and went back to his relative’s house on Francis Drive. However, King and Ben kept going on to New Orleans East. About thirty minutes later, King and Ben came to the house on Francis Drive without Javier and without the Expedition. King gave defendant $2,000.00 and told defendant, “We handled that,” which defendant interpreted to mean that they got rid of Javier by killing him. Defendant said that he and King discussed beforehand that they were going to go inside the apartment and get *1179 the money and the drugs, and that they would wait for Javier to come home. Defendant stated that they did not discuss killing Javier beforehand. In his statement, defendant also admitted that they took a 9 mm gun and money from Javier’s house.
DAt trial, defendant presented a different version of events.[3] According to defendant, on November 2, 2007, he and King went to Mr. Sanchez’s apartment to buy four kilos of cocaine for $84,000.00. After Mr. Sanchez opened the door, they weighed the cocaine and then gave it to Ms. Abreu to start cooking it to increase its volume. At some point, Mr. Sanchez left the apartment to get some “runners,” individuals who would pick up cars with secret compartments to transport the drugs. When Ms. Abreu finished cooking the cocaine, they weighed it again and discovered that it was half a kilo short.
Defendant, King, and Rene Izaguirre, who defendant claimed was also there, started searching the apartment for the drugs. Ms. Abreu was uncooperative in finding the missing cocaine, and they eventually restrained her by taping her to the bedposts with duct tape. Ms. Abreu complained about the tape on her wrists, so defendant cut the tape off and tied her with a belt and a telephone cord. In the meantime, King and Izaguirre worked out a deal. Izaguirre subsequently released Ms. Abreu and told her to give defendant and King $9,000.00 back. Ms. Abreu went upstairs, retrieved the money, and gave it to King. As defendant and King were preparing to leave, Mr. Sanchez returned with two runners. Ms. Abreu ran downstairs crying and speaking in Spanish. While Ms. Abreu, Mr. Sanchez, and Mr. Izaguirre were speaking in Spanish, defendant and King left the apartment in King’s Monte Carlo. King drove defendant to his car, and defendant headed back to his home in Baton Rouge. When he found out he was wanted by the police, defendant went to Houston to “regroup.”

ASSIGNMENT OF ERROR NUMBER ONE

In his first assigned error, defendant challenges the sufficiency of the evidence used to convict him of second degree murder. Specifically, defendant |3contends that the State failed to prove beyond a reasonable doubt that he murdered Mr. Sanchez, noting that no witness or evidence linked him to that murder. Defendant asserts that after the drug deal, he drove home to Baton Rouge and was unaware of any plan or intent to kill Mr. Sanchez.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
In cases involving circumstantial evidence, the trial court must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” *1180 LSA-R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83; State v. Washington, 03-1135 (La.App. 5 Cir. 1/27/04), 866 So.2d 973, 977.
In the present case, defendant challenges his second degree murder conviction. Second degree murder is the killing of a human being: 1) when the offender has a specific intent to kill or to |ininflict great bodily harm; or 2) when the offender is engaged in the perpetration or attempted perpetration of second degree kidnapping (or other enumerated felonies) even though he has no intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1. Although the jury was charged with both theories, defendant was indicted under the second theory, LSA-R.S. 14:30.1A(2). In the indictment, the Jefferson Parish Grand Jury alleged that defendant and his two co-defendants killed the victim while they were engaged in the perpetration of the second degree kidnapping of the victim.
Under LSA-R.S. 14:24, “[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.” Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. State v. Pierre, 93-893 (La.2/3/94), 631 So.2d 427, 428; State v. King, 06-554 (La.App. 5 Cir. 1/16/07), 951 So.2d 384, 390, writ denied, 07-371 (La.5/4/07), 956 So.2d 600.
Mere presence at the scene of a crime does not make one a principal to the crime. However, “[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice’s intention.” State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223, 1225; State v. Page, 08-531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449, writ denied, 09-2684 (La.6/4/10), 38 So.3d 299.
In the instant case, the State presented evidence at trial to show that defendant was guilty of second degree murder, in that he was at least a principal to the second degree kidnapping of the victim, and the victim was killed during the commission of that offense. Ms. Abreu testified that defendant, King, and another perpetrator pointed guns at her and forced their way into the apartment she shared with Mr. Sanchez. The perpetrators proceeded to search the apartment for two | n kilos of cocaine and money. Although they did not find the cocaine, they took money, jewelry, cell phones, and a pistol. During the search, one of the men tied Ms. Abreu to a bedpost in an upstairs bedroom with duct tape, which defendant subsequently removed and then re-tied her loosely with a belt and a cord.
While tied up, Ms. Abreu heard Mr. Sanchez’s car alarm, after which she heard him enter the apartment. She then heard something fall onto the floor and shortly thereafter, she got up and saw Mr. Sanchez and the other men leave the apart *1181 ment. When Ms. Abren looked out the window, she saw Mr. Sanchez in the back seat of his Ford Expedition with one man on each side of him and someone in the driver’s seat. A few hours later, Mr. Sanchez’s body was found on the side of the road in New Orleans East. The coroner determined he had been fatally shot once in the abdomen. A few days later, the victim’s SUV was found backed into the driveway of a vacant duplex in New Orleans East, one block from defendant’s relative’s house. The interior of the SUV was burned and there was damage to the ignition area. Ms. Abreu positively identified defendant in a photographic lineup as one of the perpetrators, and defendant’s fingerprints were found on a liquor bottle inside the apartment.
Defendant admitted in his statement that he, Ben, and King entered Mr. Sanchez and Ms. Abreu’s apartment, that King and Ben were armed with guns, and that they took money and a pistol. He also admitted in his statement that they then forced Mr. Sanchez into his vehicle and drove him to New Orleans East, and that King later told defendant in so many words that he had killed Mr. Sanchez. However, at trial, defendant claimed that his statement was fabricated and the detectives told him what to say. Defendant also claimed at trial that he and the other perpetrators did not force their way inside the apartment, that Mr. Sanchez allowed them inside to conduct a drug deal, that they were not armed with 112weapons, that defendant and King left Mr. Sanchez’s apartment while Mr. Sanchez was still there, that he did not kill Mr. Sanchez, and that he was not in New Orleans East when Mr. Sanchez was murdered.
After hearing the testimony and considering the evidence, the jury obviously found the State’s witnesses to be more credible than defendant. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Turner, 05-75 (La.App. 5 Cir. 5/31/05), 904 So.2d 816, 828, writ denied, 05-2591 (La.5/26/06), 930 So.2d 20.
Based on the foregoing, we find that a rational trier of fact could have found that the evidence, although largely circumstantial, was sufficient under the Jackson standard to support defendant’s second degree murder conviction. From the evidence, a rational trier of fact could have reasonably found that defendant, King and another perpetrator entered Mr. Sanchez and Ms. Abreu’s apartment, that they were armed with guns, that they took money, jewelry, pistols, and cell phones, and that they then kidnapped Mr. Sanchez and took him to New Orleans East, where one of the three men shot and killed him and dumped his body on the side of the road. A rational trier of fact could have reasonably assumed that the victim was murdered by the persons who kidnapped him. State v. Morris, 99-3075 (La.App. 1 Cir. 11/3/00), 770 So.2d 908, 926, unit denied, 00-3293 (La.10/12/01), 799 So.2d 496, cert. denied, 535 U.S. 934, 122 S.Ct. 1311, 152 L.Ed.2d 220 (2002). | ^Accordingly, we find no merit to defendant’s arguments relating to the sufficiency of the evidence.

ASSIGNMENT OF ERROR NUMBER TWO

In his second assigned error, defendant contends that the trial judge erred by *1182 limiting his right to present a defense. Specifically, he contends that the trial judge erred by prohibiting defense counsel from questioning Detective Renaudin regarding a bloody fingerprint that was found bn the passenger side of the vehicle of Rene Izaguirre, a known drug dealer, an associate of the victim, and the person Ms. Abreu went to look for immediately after the robbery. Defendant further contends that the trial judge erred by excluding evidence of the police investigation into Mr. Izaguirre regarding the charges in the instant case.
At trial, Ms. Abreu testified on direct and cross-examination that after the robbery, she drove to Mr. Izaguirre’s house on Harvard Street because Mr. Izaguirre was one of Mr. Sanchez’s best friends, and she thought he might know where Mr. Sanchez was. On cross-examination, Detective Renaudin testified that the DEA told him Mr. Sanchez was a person of interest, as well as the Harvard address, in a narcotics investigation. He further testified that the DEA had obtained a search warrant for the Harvard Street address where certain items were found, including drug paraphernalia, ammunition, and $73,000.00.
Defense counsel elicited from Detective Renaudin on cross-examination that Mr. Izaguirre and another individual, John Lusena, had alibis that checked out. Detective Renaudin explained that Mr. Iza-guirre and Mr. Lusena were also excluded as suspects because they did not fit the descriptions of the perpetrators given by Ms. Abreu and their fingerprints were not found in the apartment, unlike King and defendant, whose fingerprints were found in the apartment. Additionally, the detective asserted that the Jefferson Parish Sheriffs Office ran |14the names of Mr. Izaguirre and Mr. Lusena through the computer and learned that they did not have a violent criminal history, as opposed to the suspects that had already been identified, King and defendant.
During the cross-examination of Detective Renaudin, defense counsel asked the detective whether he recalled that his report went into some detail regarding the search of the Harvard Street address by members of the State Police. The State objected that it was irrelevant to the issues the jury had to decide, and that the Jefferson Parish Sheriffs Office did not seize anything from that residence and did not participate in that search. Defense counsel replied that he had a right to explore this area because the section of the report in question was more than one or two pages, it was significant, it was part of the investigation, and it was part of his client’s defense as it was their contention that Mr. Izaguirre was involved in this murder. The trial judge ruled that it was irrelevant to the instant case.
Later on during cross-examination, defense counsel asked Detective Renaudin whether he had included in his report information about a bloody fingerprint on the exterior portion of the front passenger door of Mr. Izaguirre’s vehicle. Detective Renaudin responded that he had, after which the State objected. The trial judge then sustained the objection and ordered defense counsel to move on to something else, stating that the detective had already said it was not his investigation, but the investigation of the State Police, that led to the discovery of that information. Defense counsel noted his objection for the record.
Both the Sixth Amendment to the United States Constitution and Article I, *1183 § 16 of the Louisiana Constitution guarantee a criminal defendant the right to present a defense. State v. Decay, 07-966 (La.App. 5 Cir. 6/19/08), 989 So.2d 182, 144, writ denied, 08-1634 (La.4/13/09), 5 So.3d 161. However, the right to present a defense does not require the trial court to permit the introduction of |1sevidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. State v. Marsalis, 04-827 (La.App. 5 Cir. 4/26/05), 902 So.2d 1081, 1088. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. LSA-C.E. art. 401.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. LSA-C.E. art. 801 C. Hearsay is not admissible except as otherwise provided by the Louisiana Code of Evidence or other legislation. LSA-C.E. art. 802. Nonetheless, the Louisiana Supreme Court has recognized that normally inadmissible hearsay may be admitted into evidence if it is reliable, trustworthy, and relevant, if its exclusion would interfere with the defendant’s constitutional right to present a defense. State v. Marsalis, 902 So.2d at 1088.
However, the Supreme Court has noted that this “fairness exception” to the hearsay rale was an unusual exception and should be sparingly applied. State v. Trahan, 576 So.2d 1, 11 (La.1990). A trial judge’s determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. State v. Jacobs, 07-887 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, 580, writ denied, 11-1753 (La.2/10/12), 80 So.3d 468, cert. denied, — U.S.-, 133 S.Ct. 139, 184 L.Ed.2d 67 (2012).
In the instant case, we find no abuse of discretion in the trial court’s evi-dentiary rulings. The statement regarding the bloody fingerprint was inadmissible hearsay as it was sought to prove the truth of the matter asserted. Further, the circumstances herein do not warrant the use of the unusual exception to the hearsay rule. Neither Detective Renaudin nor other members of the |1⅜Jefferson Parish Sheriffs Office discovered the bloody fingerprint on the exterior of Mr. Izaguirre’s vehicle. That discovery was made by the Louisiana State Police. As such, the detective did not have direct knowledge of the circumstances surrounding that discovery.
Moreover, the trial court’s ruling excluding the evidence regarding the fingerprint and the police investigation of Mr. Izaguirre did not interfere with defendant’s constitutional right to present a defense. Although the opening and closing statements were not transcribed, it is apparent from defendant’s testimony and defense counsel’s cross-examination of Detective Renaudin that the theory of the defense was that Mr. Izaguirre may have been responsible for the victim’s murder. The record shows that, despite the particular ruling at issue, defendant had ample opportunity to present his defense. Defense counsel extensively cross-examined Detective Renaudin regarding the possibility that Mr. Izaguirre was involved in the murder. However, the detective explained that Mr. Izaguirre had an alibi for the night of the murder, did not match the *1184 description of the suspects given by Ms. Abreu, and did not have a violent criminal record, whereas King and defendant matched the description of the suspects, were positively identified by Ms. Abreu, and their fingerprints were found in the apartment.
Accordingly, we find that the trial court did not abuse its discretion in excluding the evidence relating to the bloody fingerprint or the police investigation of Mr. Izaguirre. Moreover, we find that the trial court’s rulings, in no way, hampered defendant’s right to present a defense.

PRO SE ASSIGNMENT OF ERROR NUMBER ONE

In his first pro se assigned error, defendant seeks review of the trial court’s denial of his motion to suppress statement. He contends that his statement was not 117freely and voluntarily given but rather was the result of physical and psychological abuse by the police.
Sergeant Troy Bradberry and Detective Regina Williams testified at the suppression hearing regarding defendant’s statement. Sergeant Bradberry, a twenty-two year veteran of the Jefferson Parish Sheriffs Office, testified that on December 5, 2007, he travelled with Detective Renaudin to Texas to take custody of defendant and to bring him back to Jefferson Parish. As soon as they got into the police vehicle and prior to any conversation with defendant, Sergeant Bradberry read defendant his rights by using a card. According to Sergeant Bradberry, defendant indicated that he understood his rights and defendant did not inform him that he wanted to talk to a lawyer. During the ride back, the officers talked to defendant about the case and told him the evidence they had against him. Sergeant Bradberry acknowledged that they asked defendant questions and that defendant spoke to them most of the way home, with some breaks. According to Sergeant Bradberry, the officers did not use force, coercion, or intimidation, nor did they make any promises to him in order to get him to waive his rights and speak to them.
Sergeant Bradberry explained that during the ride, they stopped for gas, fed defendant, and allowed defendant to use the bathroom, and that defendant slept off- and-on during the ride. Once they arrived at the detective bureau, defendant requested to see the statements made against him by co-defendant King. They allowed defendant to read King’s statements, after which defendant said he wished to give a taped statement.
Sergeant Bradberry went over a written rights form with defendant at that point. Defendant signed his initials acknowledging each individual right. Defendant also signed the paragraph waiving his rights. Sergeant Bradberry [ )Stestified that nobody used any force, coercion, or intimidation, or made any promises in order to get defendant to waive his rights. Moreover, defendant did not say that he wanted to talk to a lawyer at any time, nor did he ask to terminate the interview. After executing the rights form, Sergeant Bradberry took a statement from defendant.
Detective Williams, an eight-year veteran of the New Orleans Police Department, testified at the suppression hearing that she was the lead detective on the homicide case of Mr. Sanchez and further that she had the opportunity to meet with defendant at the Jefferson Parish Detective Bureau. Detective Williams was aware that *1185 defendant had been Mirandized[4] by Jefferson Parish personnel, and that he had waived his rights, so she did not do so at that time.
Afterward, Detective Williams talked to defendant, and defendant made inculpato-ry statements to her. Neither she nor anyone else used any force, coercion, or intimidation, or made any promises in order to obtain defendant’s statement. Detective Williams testified that defendant never asked for a lawyer. She asserted that she completed a separate waiver of rights form, which defendant signed the second time she spoke to him.
After hearing the testimony, the trial judge denied defendant’s motion to suppress statement without providing reasons. Defendant now challenges this denial on several grounds. He claims that his statement was not freely and voluntarily given because he was subject to physical and psychological abuse. In addition, defendant asserts that he did not waive his rights after he was taken into custody in Texas, and that he, in fact, invoked his right to counsel and gave the officers the name of his attorney. To further support his argument that his statement should have been suppressed, defendant points to various contradictions 11flin the officers’ testimony relating to the details leading up to the taking of his taped statement. For the reasons that follow, we find no merit to defendant’s arguments.
The State has the burden of proving the admissibility of a purported confession or statement by the defendant. LSA-C.Cr.P. art. 703(D). Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove, beyond a reasonable doubt, that the defendant was first advised of his Miranda rights, that he voluntarily and intelligently waived them, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducements, or promises. State v. Loeb, 09-341 (La.App. 5 Cir. 2/23/10), 34 So.3d 917, 924-25, writ denied, 10-681 (La.10/15/10), 45 So.3d 1110.
A determination of voluntariness is made on a case-by-case basis, depending on the totality of the facts and circumstances of each situation. The admissibility of a confession or statement is a determination for the trial judge and the judge’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. Testimony of the interviewing police officer alone may be sufficient proof that a defendant’s statements were freely and voluntarily given. State v. Arias-Chavarria, 10-116 (La.App. 5 Cir. 9/28/10), 49 So.3d 426, 433, unit denied, 10-2432 (La.2/25/11), 58 So.3d 460.
In the instant case, we find that the State met its burden of proving the admissibility of defendant’s statement. The evidence at the suppression hearing, as previously set forth, reflects that defendant was advised of his rights and waived those rights prior to giving a statement. In particular, Sergeant Bradberry testified that prior to taking defendant’s statement, he went over a written rights form with defendant, who indicated that he understood his rights and wished to waive them.
12nThe evidence adduced at trial likewise reflects that defendant was ad *1186 vised of his rights and knowingly and voluntarily waived those rights prior to giving a taped statement.[5] Both Sergeant Brad-berry and Detective Williams testified at trial in accord with the testimony given at the suppression hearing. In addition, Detective Renaudin testified at trial regarding defendant’s statement. He testified that in the vehicle, on the way back from Texas, he advised defendant of his rights from a Jefferson Parish rights of arrestee form. He also explained the case to defendant and asked defendant if he wanted to make a statement at that time, but defendant only made general statements “about what was going on.” Detective Renaudin explained that defendant did not sign a waiver of rights form in the vehicle, but defendant said he understood his rights. Additionally, Detective Renaudin asserted that although defendant never waived his rights in the vehicle, no specific questions were asked of him on the ride back. Once they arrived at the Jefferson Parish Detective Bureau, defendant said he was willing to give them a statement to explain his involvement in the incident. They reviewed a rights of arrestee form with defendant line by line and filled out the information. Defendant initialed and signed the form acknowledging his understanding of his rights and his waiver of those rights.
Given the evidence presented at the suppression hearing and at trial, we find that defendant was properly advised of his constitutional rights and that he understood and waived those rights prior to giving his statement.
Defendant also argues on appeal that his statement was involuntary because the officers subjected him to physical and psychological abuse. He contends that on the ride home from Texas, Detective Renaudin persisted in making him view 121 paperwork. When defendant resisted, Detective Re-naudin slapped him repeatedly. He further contends that at another point, the officers pulled the vehicle over, and Sergeant Bradberry pulled defendant out of the vehicle and encouraged him to escape. Defendant thought the officers were going to kill him, so he sat down, and the officers put him back in the vehicle. Once back in the vehicle, Detective Renaudin allegedly slapped him again, called him derogatory names, and told him he was not going to see his sick mother again, and that he was “going down” for murder.
Defendant also asserts that when they arrived back at the bureau in Jefferson Parish, he was handcuffed to the floor of the interview room, and that the officers “kept playing mind games,” that it was freezing in the interview room, that he did not eat, that the officers beat him, and that the ATF “guy” spat on him and used a racial slur.
Despite these allegations by defendant, we find, looking at the totality of the circumstances, that defendant’s statement was voluntary. Sergeant Bradberry and Detective Williams testified that nobody used force, coercion, or intimidation, or made any promises in order to obtain defendant’s statement. They also both testified that defendant never asked to talk to a lawyer. Sergeant Bradberry explained that during the ride home, they stopped for gas, fed defendant, and allowed defendant to use the bathroom, and that defen *1187 dant slept off-and-on during the ride. He noted that once defendant saw the statements made against him by King, he wanted to give his own statement explaining his involvement.
Additionally, Detective Renaudin testified that defendant was not forced or promised anything to give his statement, nor was he beaten. Further, Sergeant Bradberry testified in rebuttal for the State at trial that neither he nor Detective Renaudin beat, slapped, or struck defendant on the way back from Texas. He 1^further testified that they did not concoct a script for defendant to read so he could give a taped statement, nor did they call him names.
In the instant case, after considering the testimony at the suppression hearing, the trial judge denied defendant’s motion to suppress statement. Given that a trial court’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of a defendant’s confession are afforded great weight and will not be disturbed unless unsupported by the evidence, we find no error in the trial court’s ruling. Based on our review of the evidence presented at the suppression hearing and at trial, we find that the State proved beyond a reasonable doubt that defendant was advised of his Miranda rights, that he voluntarily and intelligently waived them, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducements, or promises.
As part of this assigned error, defendant further asserts that he was prejudiced at the suppression hearing because all of the officers involved did not testify, and therefore, the suppression hearing should have been reopened. He also argues that the suppression hearing was conducted before he filed his own motion to suppress, and that new facts and evidence warranted another hearing.
In the present case, all of the officers involved in the taking of defendant’s statement testified either at the suppression hearing or at trial or both. Defense counsel had ample opportunity to cross-examine the officers on any circumstances surrounding the taking of defendant’s statement. Accordingly, we find that another suppression hearing was not necessary, nor was defendant prejudiced by the failure to reopen the suppression hearing.
| y,PRO SE ASSIGNMENT OF ERROR NUMBER TWO
In his second pro se assigned error, defendant contends that the trial court erred in failing to produce transcripts of rulings on his pretrial motions and further erred in failing to rule on some of his pretrial motions.
The record indicates that defendant filed numerous pro se motions in the district court. Some were ruled on without a hearing, some were ruled on after a hearing, and others were not ruled upon at all. With regard to his pro se motions that were ruled on without a hearing, there obviously would be no transcripts to produce. With regard to the motions that were ruled on after hearings, we note that defendant was provided with those transcripts and was allowed to supplement the appellate record with any missing transcripts and minute entries. In particular, on February 14, 2012, this Court granted defendant’s motion to supplement and ordered that the appellate record “be supplemented within thirty days with the transcripts and minute entries for all pre-trial motions and proceedings incorporated *1188 from the companion case 2008-0002, and that briefing dates be suspended and reset when the record is properly supplemented.” On March 5, 2012, the record was supplemented. Again, on August 28, 2012, this Court, pursuant to defendant’s motion, ordered that the appellate record “be supplemented within thirty (30) days with the transcripts and minute entries for all pretrial motions and proceedings, including those incorporated from the companion case 2008-0002, specifically held or ruled upon on November 14, 2011.” On September 18, 2012, the appellate record was supplemented.
In defendant’s pro se argument, he specifically references this Court’s writ disposition of November 10, 2011. State v. Gross, 11-K-1015 (La.App. 5 Cir. 11/10/11). In response to defendant’s complaint that various motions had not been ruled on, this Court granted defendant’s writ application as follows:
124Relator claims, in this writ application, that the trial court has failed to rule on various pretrial motions, including his “Motion to Suppress Statement” filed on August 17, 2011, “Defendant’s Supplement and Exhibits to Adopted Motion to Quash Indictment” filed on August 11, 2011, “Motion for the Defendant [sic] Submission of Questions” filed on June 28, 2011, “Memorandum in Support of Defendant’s Motion to Dismiss” filed on June 15, 2011, “Motion to Suppress Identification” filed on March 14, 2011, and “Motion for Bill of Particulars” filed on March 2, 2011.
It appears that the motions in question have not yet been ruled upon and that trial is set for November 14, 2011. Accordingly, the writ application is granted and the trial court is hereby ordered to rule on relator’s motions at or before the beginning of trial, it if [sic] has not already done so.
In his appellate brief, defendant suggests that these motions have not been ruled upon, and if they were ruled upon, he has not been provided with transcripts from the hearings on these motions. From our review of the record, it does not appear that there were rulings on any motions by the trial judge subsequent to this Court’s November 10, 2011 disposition and prior to the start of trial.[6] In fact, on November 15, 2011, the first day of trial, defense counsel stated on the record that he assumed that all motions had been disposed of. The trial judge replied that he thought they had. This Court’s November 10, 2011 disposition was not discussed, and the trial thereafter commenced.
A defendant waives all pending motions by permitting trial to proceed without raising the issue that his pretrial motions were neither heard nor ruled upon. State v. Alexander, 97-1199 (La.App. 5 Cir. 9/29/98), 720 So.2d 82, 86, writ denied, 98-3109 (La.4/9/99), 740 So.2d 628. In the instant case, defendant proceeded to trial without raising the issue that some of his pretrial motions were neither heard nor ruled upon. Therefore, we find that any outstanding motions, including the ones referenced above, that were not ruled upon prior to trial were waived.
|2fiWe further note that defendant was represented by counsel. A trial court is not required to entertain pro se motions when a defendant is represented by coun *1189 sel and entertaining the motions -will lead to confusion at trial. State v. Holmes, 06-2988 (La. 12/2/08), 5 So.3d 42, 94, cert. denied, 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009); State v. Horton, 09-250 (La.App. 5 Cir. 10/27/09), 28 So.3d 370, 379.
Accordingly, we find no merit to the arguments raised by defendant in this pro se assignment of error.

ERROR PATENT REVIEW

We have also reviewed the record for errors patent, in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
Our review of the record reveals that the trial court failed to advise defendant of the time period within which to apply for post-conviction relief, as required by LSA-C.Cr.P. art. 930.8. While the commitment reflects that defendant was given a proper advisal of the time period, the transcript indicates that the trial court did not advise him of the time limitation. In accordance with the procedure routinely employed by this Court, we advise defendant, by this opinion, that no application for post-conviction relief, including an application for an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence have become final under the provisions of LSA-C.Cr.P. arts. 914 or 922. State v. Neely, 08-707 (La.App. 5 Cir. 12/16/08), 3 So.3d 532, 538, writ denied, 09-0248 (La.10/30/09), 21 So.3d 272.
| ^OUTSTANDING WRIT APPLICATION AND MOTIONS
We now turn our attention to the writ application that was consolidated with the instant appeal and to the motions that were filed by defendant in this Court and referred to the merits of the appeal.

Writ Application Number I2-KH-826

On October 25, 2012, defendant filed a “Motion for Suspension and Supplement,” which this Court treated as a writ application and consolidated with the instant appeal. In his motion, defendant requests that his appeal be suspended so he can obtain more records, documents, and transcripts. Further, he contends that the trial judge never had hearings on the pretrial motions he and his attorney filed, and that he never waived his right to those hearings. Defendant also asks this Court to order the trial court to furnish transcripts of any rulings on his motions.
As noted in our discussion in pro se assignment of error number two, defendant was provided with the transcripts from any pretrial motion hearings and was allowed to supplement the record with any missing transcripts. Moreover, defendant proceeded to trial without raising the issue that some of his pretrial motions were neither heard nor ruled upon, and therefore, waived any outstanding motions. Therefore, we find no merit to the arguments advanced by defendant in support of suspending his appeal. State v. Gross, 12-KH-747 (La.App. 5 Cir. 10/24/12). Accordingly, we find it unnecessary to suspend defendant’s appeal, and we therefore deny his writ application.

Motion to Exclude

On May 7, 2012, defendant filed a motion to exclude the opening statement of co-defendant King’s counsel. The opening statement at issue was taken from King’s trial that ended in a mistrial. It is contained in the appellate record but was not made part of the State’s evidence at trial. *1190 Defendant asserts that the State is Jurying to use this opening statement as a statement against him, and this Court should not consider it in ruling on defendant’s appeal, especially since neither King nor his attorney testified at defendant’s trial.
There is no indication in the appellate record that this opening statement was referred to or introduced as evidence at trial. Therefore, it was not considered as evidence by this Court in ruling on defendant’s appeal. Accordingly, defendant’s motion to exclude is denied.

Motion for Rulings on Motions

On July 5, 2012, defendant filed a motion for rulings on motions filed in this Court. Defendant specifically complains that this Court has failed to rule on his previously filed motion to suspend to supplement and his motion to exclude opening statement of co-defendant King’s counsel. Any outstanding motions filed by defendant in this Court have been ruled upon in this appeal, and accordingly, his motion for rulings on motions is denied as moot.

Motion of Mandamus

On July 20, 2012, defendant filed a “motion of mandamus” requesting that this Court order the trial court to produce the transcript from the motion hearing on November 14, 2011. He further requests that this Court suspend his appeal so that an adequate appellate brief can be filed. This issue has already been resolved in a previous writ application. State v. Gross, 12-KH-747 (La.App. 5 Cir. 10/24/12). On October 24, 2012, this Court issued the following disposition:
By this writ application, relator claims he has not been provided with a copy of a November 14, 2011 motion transcript. He seeks suspension of his pending appeal until the court provides him with a copy of this transcript. On August 23, 2012, this Court ordered that the record on appeal be supplemented with transcripts of all pre-trial motions and proceedings, including any proceeding held on November 14, 2011. The district court submitted the supplemental record on September 18, 2012, which contains a certification from the court reporter that nothing was taken in open court in this matter on [^November 14, 2011 and thus there is no transcript of proceedings from this date. A minute entry further indicates that upon request of the district court, trial was continued to November 15, 2011. As there is no transcript for the date specified by relator, we find no basis for the suspension of the pending appeal. The writ application is therefore denied.
Since there is no transcript from November 14, 2011, to produce, we deny defendant’s “motion of mandamus.”
Accordingly, for the reasons set forth herein, we affirm defendant’s convictions and sentences for second degree murder and armed robbery. We deny his writ application that was consolidated with the instant appeal and likewise deny his motions that were filed in this Court and referred to the merits of the appeal.

CONVICTIONS AND SENTENCES AFFIRMED; WRIT APPLICATION AND MOTIONS DENIED

. The Jefferson Parish Grand Jury also indicted co-defendant Calvin King for those same offenses.

. Dr. McGarry, a forensic pathologist at the Orleans Parish Coroner’s Office, performed an autopsy on the victim on November 3, 2007. He testified that the cause of death was internal bleeding due to one gunshot wound at close range that went through the front of the abdominal wall.

. Defendant claimed his previous statement was fabricated, that it was not freely and voluntarily given, and that the police used force and coercion to obtain the statement.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. To determine whether the trial court’s denial of a motion to suppress is correct, the appellate court may consider the evidence adduced at the suppression hearing as well as the evidence presented at trial. State v. Addison, 05-378 (La.App. 5 Cir. 12/27/05), 920 So.2d 884, 890, writ denied, 06-1087 (La. 11/9/06), 941 So.2d 36.

. The record indicates, however, that the trial court conducted hearings and issued rulings on previously filed motions to suppress statement and identification.