945 So.2d 773 (2006)
STATE of Louisiana
v.
Brian A. MILLER.
No. 06-KA-451.
Court of Appeal of Louisiana, Fifth Circuit.
October 31, 2006.
*775 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Andrea F. Long, Martin Belanger, Jr., Kia Habisreitinger, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Mark D. MacNamara, New Orleans, Louisiana, for Defendant/Appellant.
Dwight Doskey, Covington, Louisiana, for Defendant/Appellant.
Panel composed of JUDGES MARION F. EDWARDS, CLARENCE E. McMANUS, and EDWARD A. DUFRESNE, JR.
MARION F. EDWARDS, Judge.
Defendant/appellant, Brian Miller, appeals his conviction for attempted possession of cocaine. For the reasons that follow, we affirm and remand.
The Jefferson Parish District Attorney filed a bill of information charging the defendant, Brian Miller ("Miller"), with possession of 400 or more grams of cocaine, a violation of LSA-R.S. 40:967(F). The defendant pled not guilty at arraignment. Miller's grandmother-in-law, Azienell Holmes, was also charged with the same offense, but the count was dismissed in exchange for her truthful testimony at the defendant's trial.
According to the minute entry of December 17, 2002, Miller waived his right to a jury trial and proceeded to a trial before the judge. Afterwards, the trial judge found Miller guilty of the responsive verdict of attempted possession of 400 or more grams of cocaine.
That same day, the commitment reflects the trial judge imposed a sentence of fifteen years of imprisonment at hard labor.[1] Pursuant to the defendant's motion to vacate sentence, in which Miller claimed that he did not intend to waive sentencing delays, the trial judge vacated the sentence. On January 30, 2003, the trial judge sentenced Miller to fifteen years of imprisonment without benefit of parole, probation, or suspension of sentence. The court also imposed a $5,000 fine. Miller filed a timely post-conviction relief application seeking an out-of-time appeal, which the trial judge granted.
In April 1999, Detective Moran provided information that prompted Officer John Louis ("Officer Louis") of the Kenner Police Department to set up surveillance of 1500 West Esplanade, Apartment A, on April 21, 1999. Prior to setting up surveillance, Officer Louis obtained a description of the defendant from N.C.I.C., learned some of his aliases, and learned that Miller had several outstanding attachments. At approximately 7:30 p.m., on April 21, 1999, a vehicle arrived at the apartment and a man fitting the description of the defendant exited the passenger's side. The man, later identified as Miller, entered the *776 apartment with a key, exited, and locked the door. He then re-entered the vehicle, which drove away.
Officer Louis stopped the vehicle approximately one block from the apartment. Miller did not have his driver's license, but identified himself as "David Williams," which was one of the defendant's aliases. When Officer Louis said, "Try again, Brian," the defendant asked Officer Louis why he had stopped the car. Officer Louis explained that the defendant was being arrested for outstanding attachments. After Miller was handcuffed, Officer Louis noticed that there was a marijuana cigarette in the ashtray, and both the passenger and Miller were arrested.
The next day, at approximately 1:00 p.m., Officers Louis and Mitchell resumed surveillance of the apartment. Five or ten minutes later, a woman, later identified as Azienell Holmes ("Holmes"), arrived at the apartment. She went inside, and came out with a vacuum cleaner. As she was closing the door, the officers approached and identified themselves. Holmes identified herself and when asked if she knew who lived there, she said Brian, her son-in-law, lived there. According to Officer Louis, Holmes also said that Brian had called her from jail and asked her to bring the vacuum cleaner to her house across the river. Officer Mitchell testified that he only heard Holmes say that Brian was her son-in-law.
The officers then noticed a plastic bag containing a white powdered substance protruding from the top of the vacuum's zippered bag. When Officer Louis asked her about the substance, she began to panic. According to Officer Louis, Holmes denied knowing anything and reiterated that the defendant told her to bring the vacuum to her house. At that point, Officer Louis called the K-9 unit to the scene, and the dog alerted to the vacuum cleaner. Officer Louis field tested the powder, which was positive for cocaine.
Officer Louis secured a search warrant for the apartment and the vacuum cleaner. They found several bags of white powder, two larger bags of a brown powdered substance, and other plastic bags containing a mix of white and brown powder in the vacuum. The white powder tested positive for cocaine, and there was over 1000 grams of cocaine in the vacuum. According to Officer Louis, the brown powder was some sort of coco mix, presumably used to camouflage the cocaine. Inside the residence, Officer Louis found a 10 mm Glock clip containing hollow point bullets, a hand-held scale, and several documents bearing the defendant's name. There was little furniture in the apartment and no beds. There was only male clothing. They found no narcotics in the apartment and the drug dog did not alert anywhere in the apartment.
The police also found a speeding ticket for David Williams, one of the defendant's documented aliases, and a box of business cards bearing defendant's name for In "Too II Deep Records," with Brian "Gangster B" Miller Ceo, President, and an application for some sort of license for In II Deep Records, bearing the defendant's name as the CEO, President. They found a photograph of Miller, artwork of "In II Deep Records," and the defendant's credit report that listed his address as 3105 Touchwood in Harvey.
At trial, sixty-seven-year-old Holmes testified that Miller is the spouse of her granddaughter, Larhonda. Holmes said that she and Larhonda were living at 3105 Touchwood Drive in Harvey, which was Miller's and Larhonda's house. Holmes said that Larhonda paid the note. While Miller occasionally stayed there, Holmes believed he was residing at the apartment on West Esplanade. Holmes said that *777 Miller called the Touchwood residence while he was in jail and asked Holmes to pick up some of his things, including the vacuum, at the apartment on West Esplanade. Holmes admitted she had three other vacuums at home, but none of them worked.
Miller gave her the address to the apartment and she used the key that was at the Touchwood residence to enter the apartment. While there, Holmes decided she could not bring the television or Playstation because she did not know how to disconnect them. She left with the vacuum, which was in the living room, and encountered the police upon exiting the apartment. She testified that she did not know there was cocaine in the vacuum.
The record reflects that Miller had an outstanding attachment in New Orleans. Officer Tommy Powell ("Officer Powell") of the Kenner Police Department testified that, on April 26, 1999, while returning the defendant to Kenner from Orleans Parish Prison, Miller inquired about his Kenner charges. Officer Powell answered that he was not familiar with the investigation, but that it had something to do with crack cocaine. According to Officer Powell, Miller replied something to the effect that the charge related to powder cocaine, not crack.
Miller's theory of the case was that the apartment was used for his business, In Too Deep Records, but that he did not live at the apartment, and that he had not called Holmes to ask her to go to the apartment. According to the manager of the property, the apartment was leased to "Mimh Bui (Sam)." However, he had no checks or correspondence from Bui after the lease was signed.
Miller's brother, Shevone Miller, said that the defendant was living at 3105 Touchwood in Harvey. Shevone Miller testified that the defendant could not call home because there was a block on the phone for collect calls. As such, Shevone Miller arranged a 3-way phone call between the defendant, himself and Larhonda, in which the defendant told Larhonda to get their son's medicine from the apartment. Shevone Miller said that he had been to the apartment once or twice with the defendant, but he did not know who lived there. The defendant's cousin, Aaron Martin ("Martin"), said that he went to the apartment once or twice a week after work to visit the defendant, who was working with a rap artist. According to Martin, the apartment was used as a place to write rap music. Many people, including Sam, whom Martin described as an "Asian fellow," had keys to the apartment. Martin testified that Tyshawn Walker ("Walker"), the vice-president of the defendant's company, was often at the apartment. Martin testified that no one regularly slept at the apartment, but that people from out of town would occasionally stay there. But, the defendant never slept there. Diedra Turnbull ("Turnbull"), the girlfriend of Walker, testified that Walker was incarcerated in the federal penitentiary on drug charges. According to Turnbull, Walker lived at the apartment. Turnbull testified that Walker was selling drugs at the time and always had a lot of money. Turnbull frequently met a lot of people from out of town with "gangster names" and saw Miller at the apartment a few times.
In his second assignment of error, Miller raises issues regarding the sufficiency of the evidence and another trial error. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of *778 the evidence.[2] If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary.[3] On the other hand, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial.[4] Therefore, the sufficiency of the evidence is addressed before the other assignment.
Miller contends that the evidence was insufficient to support his conviction because the State failed to prove that he had the specific intent to possess the cocaine and that he was not in constructive possession of the cocaine. The State responds that the evidence supports his conviction.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia,[5] requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.[6] The rule as to circumstantial evidence is "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." LSA-R.S. 15:438. This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt.[7] Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.[8]
In this case, Miller was charged with possession with 400 or more grams of cocaine, but he was convicted of the lesser charge of attempted possession of 400 or more grams of cocaine, violations of LSA-R.S. 40:967(F)(1)(c) and R.S. 14:27. To support a conviction for possession of cocaine in violation of LSA-R.S. 40:967(F)(1)(c), the State must present evidence establishing beyond a reasonable doubt that: (1) the defendant was in possession of the drug; (2) the defendant knowingly and intentionally possessed it; and (3) the amount possessed was 400 grams or more of cocaine or of a mixture or substance containing a detectable amount of cocaine or of its analogues as provided in Schedule II(A)(4) of R.S. 40:964.[9]
A person not in physical possession of the drug is considered to be in constructive possession of a drug, even though it is not in his physical custody, when the drug is under that person's *779 dominion and control.[10] Factors to be considered in determining whether a defendant exercised dominion and control sufficient to constitute constructive possession include: (1) the defendant's knowledge that illegal drugs were in the area; (2) his relations with the person found to be in actual possession; (3) the defendant's access to the area where the drugs were found; (4) evidence of recent drug use by the defendant; (5) the existence of paraphernalia; and (6) evidence that the area was frequented by drug users.[11]
An attempt is defined in LSA-R.S. 14:27, which, in pertinent part, provides:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
. . . .
C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.
Specific criminal intent exists "when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant.[12]
Miller contends that the State failed to prove that he possessed or attempted to possess the cocaine. In particular, he argues that there is no evidence he knew the cocaine was in the vacuum cleaner or any evidence that the cocaine was in the apartment at the same time he was there. However, we find that the evidence is sufficient to prove that Miller had the specific intent to possess the cocaine and that he did an act in furtherance of his object.
Although there was evidence that the apartment was frequented by many people, there was also evidence that Miller resided there and that the apartment was frequented by a drug dealer, Walker, who was Miller's business partner. Testimony that Miller lived at the apartment came from Holmes, who said that it was her understanding that Miller resided at the apartment, and from Detective Moran, who said that Miller provided this address when booked on other charges relating to an incident at the apartment. In addition, several personal documents bearing Miller's name were found at the apartment, and Miller also had a key to the apartment.
A defendant's guilty knowledge may be inferred from the circumstances of the transaction.[13] Despite the defendant's contention that he did not know there was cocaine at the apartment, the record contains evidence of his guilty knowledge. The defendant's assertion to Officer Powell that the Kenner charges involved powder cocaine, not crack, is indicative of his guilty knowledge. In addition, the unusual request for Holmes, who had never been to *780 that apartment before, to procure the vacuum evidences Miller's guilty knowledge.
When returning the verdict, the trial judge acknowledged that there were discrepancies about whether Miller personally told Holmes to obtain the vacuum or whether the instruction was communicated by another family member. But, the trial judge was convinced that the instruction emanated from Miller and that the telephone call directing Holmes to get the vacuum cleaner was an act in furtherance of his intent to possess the cocaine.
Under these circumstances, we find that the trial judge could rationally reject the hypothesis of innocence advanced by Miller, and could find that the evidence proved beyond a reasonable doubt that the defendant attempted to possess 400 or more grams of cocaine.
Miller also argues that the trial court erred by admitting into evidence Holmes' prior recorded statement to the police. Miller claims that the error was not harmless because the statement improperly bolstered Holmes' testimony. The State responds that the trial judge properly admitted the statement.
At trial, Holmes testified that she told the truth in her recorded statement to the police following her arrest. She then recounted how she came to be in possession of the vacuum cleaner, particularly, that Miller asked her to obtain his things, including the vacuum cleaner. When asked by the prosecutor whether she remembered Miller asking her to take the vacuum cleaner out of the house, she responded, "Because we needed one."[14]
On cross-examination, Miller attempted to clarify whether Holmes had said that he told her she could have the vacuum cleaner if she needed one, or whether the defendant just told her to go get the vacuum cleaner. Miller confronted Holmes with her testimony when entering her guilty plea on August 30, 2001. She acknowledged she may have said that Miller told her she could have the vacuum if she needed one. Holmes explained that "it could have been either way," but that Miller did tell her to get the vacuum cleaner. She testified she said the same thing to the police.
Holmes was then confronted with a statement she gave to the defendant's attorney, Robert Glass, earlier in the year preceding trial. At trial, Mr. Glass read portions of the statement indicating that Holmes said Miller did not mention the vacuum cleaner, but just asked her to get his things.[15] Holmes essentially disavowed the statement, saying that her granddaughter, Larhonda, had made the statements to Mr. Glass. Holmes said she just signed the statement because she wanted Mr. Glass to leave and because Larhonda asked her to sign it. Holmes also said she didn't know what she was signing because she wasn't wearing her glasses. During cross-examination, Mr. Glass suggested that Holmes pressured Larhonda from testifying on the defendant's behalf by threatening to cease babysitting for her, which Holmes denied. However, Holmes admitted that she told Mr. Glass that they needed a vacuum cleaner, because they had three that did not work. She also said that Miller asked *781 her to get the vacuum cleaner, that was her "story," and she was "sticking to it."
During the testimony of Officer Mitchell, the State moved to admit Holmes' statement to the police. The trial judge admitted the recorded statement pursuant to LSA-C.E. art. 801(D)(1)(b) over the defendant's objection. A review of the recorded statement reflects that it is substantially consistent with her trial testimony that she obtained the vacuum at the defendant's request and that she did not know the vacuum's contents. In the statement, Holmes explicitly said that she thought Miller wanted her to obtain the vacuum because they needed one at home.
LSA-C.E. art. 801(D)(1)(b) provides that a statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.
Miller contends that LSA-C.E. art. 801(D)(1)(b) requires that the event producing the fabrication or improper motive occur between the statement and the testimony. According to the defendant, the statement was not admissible because Holmes' motive to lie, that is to protect herself, existed when she made the statement to the police. In support, the defendant cites Tome v. United States,[16] a plurality opinion in which the Supreme Court interpreted Federal Rule of Evidence 801(D)(1)(b) to permit the introduction of a declarant's consistent out-of-court statement to rebut a charge of recent fabrication or improper motive only when the statement was made before the alleged recent fabrication or improper influence or motive. In Tome, the defendant was charged with sexually abusing his four-year-old daughter on an Indian reservation after the child reported the allegations to her mother while in her mother's custody. By the time of trial, the child was six and one-half years old and her testimony consisted mostly of one-word answers to leading questions. Thereafter, the State moved to introduce several statements implicating the defendant that the child made to various individuals The trial judge found the statements were admissible to rebut the defendant's charge that her testimony was motivated by a desire to live with her mother.[17] However, the Supreme Court held that the statements were not admissible because they were not made before the charged recent fabrication or improper influence or motive.[18]
The instant case is distinguishable from Tome. First, it seems that the principle purpose for the statements in Tome was to supply substantive evidence of the allegations, where the child-victim's testimony was composed of mostly one-word answers to leading questions. Here, Holmes gave narrative explanations in her testimony, not one-word answers to leading questions. Further, the record reflects that the implications of fabrication arose during the defendant's cross-examination of Holmes.
In State v. Jones,[19] this Court held that a witness' prior recorded statements to the police were admissible under LSA-C.E. art. 801(D)(1)(b) to rehabilitate the witness' credibility, where the defendant called the witness' credibility into question *782 in the opening statement and during trial. In reaching its decision, the Jones court cited State v. Easter,[20] in which the court found that a witness' prior police statement was admissible under LSA-C.E. art. 801(D)(1)(b). In Easter, the defendant alleged on cross-examination that the witness' trial testimony differed from the prior statement given to the police. Over the defendant's objection, the officer who took the statement testified about the substance of the statement, which was substantially consistent with the witnesses' trial testimony.
In the present case, Miller sought to discredit Holmes during cross-examination by suggesting that her testimony was a recent fabrication because she had given two different versions of the events since her original statement to the police. As such, we find that the trial judge did not err in admitting the statement to rebut the defendant's suggestion of recent fabrication.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux,[21] and State v. Weiland.[22] Miller has requested an error patent review; however, this Court routinely reviews the record for errors patent regardless of whether defendant makes such a request. The following matters are noted:
The trial minute entry dated December 17, 2002 states that Miller waived a jury trial, while the transcript does not contain any mention of the waiver. Rather, the transcript begins with testimony of the first witness.
A defendant is entitled to a trial by jury of six persons when the confinement for the offense may be at hard labor.[23] The offense for which the defendant in this case is charged is punishable at hard labor.[24] Thus, the defendant in this case was entitled to a jury trial.
Miller has not raised the lack of a valid jury waiver as an assignment, but this issue has been recognized as an error patent.[25] Although the right to a jury trial may be waived in non-capital cases, it must be "knowingly and intelligently" waived.[26] Waiver of this right is never presumed.[27] Although it remains the preferred method for the trial judge to advise a defendant of the right to a jury trial in open court before obtaining a waiver, that practice is not statutorily required.[28] Further, while it is preferred for the defendant to waive the right to a jury trial personally, counsel may waive the right on the defendant's behalf, provided the defendant's decision to do so was made knowingly and intelligently.[29]
*783 When there is no valid jury waiver in the record, the case is conditionally affirmed and remanded to the trial court for an evidentiary hearing on the question of whether the defendant validly waived the right to a jury trial.[30] If the evidence shows that the defendant did not make a valid waiver, the trial court must set aside the conviction and sentence and grant the defendant a new trial. If the trial court rules adversely to the defendant, then the defendant's right to that ruling is reserved.[31]
Accordingly, we conditionally affirm Miller's conviction and remand for an evidentiary hearing in accordance with the jurisprudence cited, supra.
There is a discrepancy between the transcript and the commitment in that the commitment reflects the trial judge gave Miller four days of credit for time served while awaiting extradition from California, whereas the transcript does not. Generally, when there is a discrepancy between the minutes and the transcript, the transcript prevails.[32] Accordingly, we order the trial court to resolve the discrepancy in the transcript and the commitment regarding the credit for time served.
The record also reveals that the defendant was not advised of the time limit for filing an application for post-conviction relief as required by LSA-C.Cr.P. art. 930.8. However, informing the defendant of these provisions is unnecessary because the defendant filed a motion for out-of time appeal, thus exercising his right to post-conviction relief.[33]
Accordingly, for the foregoing reasons, the defendant's conviction is conditionally affirmed, and we remand for further proceedings consistent with this opinion.
AFFIRMED; REMANDED.
NOTES
[1] The sentence was not transcribed. The record contains a letter from the defendant's attorney indicating his agreement for the record to be lodged without the transcript of the sentencing.
[2] State v. Hearold, 603 So.2d 731, 734 (La. 1992).
[3] Id.
[4] Id.
[5] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
[6] State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
[7] State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208.
[8] Id.
[9] State v. Major, 03-3522 (La.12/1/04), 888 So.2d 798, 802; LSA-R.S. 40:967(F)(1)(c).
[10] State v. Young, 05-702 (La.App. 5 Cir. 2/14/06), 938 So.2d 90, 94.
[11] State v. Young, supra.
[12] State v. Lee, 03-901 (La.App. 5 Cir. 12/9/03), 864 So.2d 654, 659.
[13] State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517, 521, 523.
[14] When the prosecutor asked her if she thought that was the reason the defendant asked her to remove to vacuum cleaner, the judge sustained the defendant's objection to the prosecutor characterizing Holmes' testimony.
[15] The statement was not introduced into evidence, but Mr. Glass read portions of it into the record when questioning Holmes.
[16] 513 U.S. 150, 156, 115 S.Ct. 696, 700, 130 L.Ed.2d 574 (1995).
[17] 513 U.S. at 153-56, 115 S.Ct. at 699-700.
[18] 513 U.S. at 167, 115 S.Ct. at 705.
[19] 02-908 (La.App. 5 Cir. 2/25/03), 841 So.2d 965, writ denied, 03-0895 (La.9/26/03), 854 So.2d 345.
[20] 32,940 (La.App. 2d Cir.4/07/00), 756 So.2d 703, writs denied, 00-1321 (La.2/9/01), 785 So.2d 28, 00-2529 (La.6/29/01), 794 So.2d 823.
[21] 312 So.2d 337 (La.1975).
[22] 556 So.2d 175 (La.App. 5 Cir.1990).
[23] See, LSA-C.Cr.P. art. 782 and La. Const. art. I, § 17.
[24] See, LSA-R.S. 40:967(F)(2)(c).
[25] See, State v. Goodwin, 05-51 (La.App. 5 Cir. 6/28/05), 908 So.2d 56, 59; State v. Lokey, 02-1087 (La.App. 5 Cir. 2/25/03), 840 So.2d 653, 655-56, writ denied, 03-1212 (La.11/7/03), 857 So.2d 518.
[26] LSA-C.Cr.P. art. 780(A).
[27] State v. Lokey, supra.
[28] State v. Pierre, 02-2665 (La.3/28/03), 842 So.2d 321 (per curiam); State v. McCloud, 04-1112 (La.App. 5 Cir. 3/29/05), 901 So.2d 498, 503, writ denied, 05-1450 (La.1/13/06), 920 So.2d 235.
[29] State v. Pierre; State v. McCloud, supra.
[30] See, State v. Nanlal, 97-786 (La.9/26/97), 701 So.2d 963.
[31] Id.
[32] State v. Lynch, 441 So.2d 732, 734 (La. 1983).
[33] See, State v. Rose, 97-943 (La.App. 5 Cir. 1/27/98), 708 So.2d 1093, 1095.