ROBERT M. MURPHY, Judge.
|2Pefendant, Honoré Estes, appeals her conviction and sentence for second degree murder. For the reasons that follow, we affirm.
Defendant was indicted by a Jefferson Parish Grand Jury on June 21, 2012, for one count of second degree murder, a violation of La. R.S. 14:30.1. After entering a plea of not guilty, defendant proceeded to trial on March 19, 2013,[1] and was found *850 guilty as charged on March 22, 2013. On May 7, 2013, defendant was sentenced to life imprisonment without the benefits of parole, probation, or suspension of sentence. Defendant’s Motion For A New Trial was also denied on that date. This appeal follows.

FACTS

Julie Jensen testified that on March 4, 2012, she lived on Daffodil Lane.[2] On that date, her children informed her about an argument that was taking place down the street. A short time later, Jensen’s children returned and told her the people who were arguing had a gun, at which time Jensen went out to her front porch. She witnessed an African American couple approximately three houses over. The Uwoman in the driveway had her hands on the top of a car, and Jensen could see that the woman had a gun in her hand. The man, who was sitting, had the passenger side door of a car open. Jensen saw the woman walk from behind one car and in between two cars, while waving a gun up and down. Jensen heard a gunshot, and then saw the woman go to the ground while yelling at the man to get up; however, the man did not respond. The woman ran inside then came back out again and yelled at the man to “get up.” At that point, Jensen called 9-1-1 and reported the shooting. Jensen also told her neighbor, Joyce Moore, about what she had seen. Jensen testified that she did not see an altercation between the woman and the man, or a struggle for a purse or gun prior to the shooting. The man was standing still while the woman waived the gun. Jensen had never met defendant or the victim.
On cross-examination, Jensen stated that one of the cars blocked her view of the argument from the waist down, and she did not know whether someone else’s hand may have been on the gun. Jensen further testified that defendant did not stand in a “firing position” at the time of the shooting.
Joyce Moore testified that on March 4, 2012, she lived at 121 Daffodil Lane and was acquainted with defendant as a neighbor.[3] On that date, Moore was leaving her home when she was informed by Julie Jensen about what had happened to the victim, Nicholas Houston. Moore immediately crossed the street to defendant’s home, where she found defendant on the phone with 9-1-1. Defendant told Moore that “it was an accident” and that the gun had gone off while defendant and Houston were arguing. Moore observed Houston’s body between two cars in the driveway. After defendant had been put into the police car, Moore went into defendant’s home to be with defendant’s two children.
|4On cross-examination, Moore said that she did not hear any yelling outside prior to the time that she left her home on the date of the shooting. Moore testified that defendant told her that Houston had grabbed or pulled her, and Moore noted that it looked like a part of defendant’s shirt had been ripped. Defendant also appeared to be upset.
Ten witnesses,[4] all of whom were minors at the time of trial, provided consistent *851 testimony regarding the shooting, with little varying detail. In summary, these witnesses observed defendant and Houston engaged in a verbal argument in the driveway. At no time did Houston become physically violent with defendant. Defendant went to her trunk and retrieved a gun, which she then pointed up and down at Houston while they stood approximately seven feet apart in the driveway between the two parked cars. Houston unsuccessfully attempted to get the gun from defendant. Defendant then shot Houston, and immediately thereafter got down on the ground with him, apparently in an attempt to revive him.
Deputy Scott Bradley testified that he was a patrol deputy for the Jefferson Parish Sheriffs Office 3rd District. He received a call for service at 116 Daffodil Lane on March 4, 2012, in response to a shooting. Upon arriving, Deputy Bradley observed a black male lying between two parked cars in the driveway, and defendant [5] was exiting the house. Deputy Bradley approached defendant, and he asked her what had happened. Defendant’s response was that “she did it.” Deputy Bradley then searched defendant and placed her in the back of his police unit; defendant was not handcuffed at that time. When asked where the gun was, defendant told Deputy Bradley that it was inside of her purse. The gun was, in fact, located in defendant’s purse, which was on the roof of one of the vehicles parked |.Jn the driveway. When asked what had happened with respect to the shooting, defendant told Deputy Bradley that she and the victim were arguing over items of clothing “when she swung her purse, and the gun went off.” Deputy Bradley secured the scene until Sergeant Fernandez and Deputies Berthelot and Porche arrived. On cross-examination, Deputy Bradley said that defendant did not try to flee the scene of the shooting.
Sergeant Randall Fernandez testified that he was a sergeant assigned to the 4th district patrol division of the Jefferson Parish Sheriffs Office, but was a homicide detective on March 4, 2012. After receiving a call for assistance on that date, Sergeant Fernandez proceeded to 116 Daffodil. Upon arrival, he noted the crime scene tape had been placed, and Houston’s body was in the driveway between two cars. Sergeant Fernandez was informed by the other deputies that there were witnesses in the area. He looked at the purse, but did not touch or manually manipulate it. Sergeant Fernandez observed a Glock pistol inside. Following this, he took measurements and photographs of the crime scene. Among the photographs taken was an image of the fired cartridge case of the round that fatally struck Houston. Other photographs included blood spatter on the door of the BMW, defendant’s purse, which was on the hood of the BMW, and the Glock pistol which was in the purse with the grip pointing upward.
On cross-examination, Sergeant Fernandez testified that no tests for gunshot residue were conducted of defendant’s hands or Houston’s hands, because the practice had previously been discontinued by the department. The blood spatter at the scene was on the lower part of the BMW’s driver door.
Deputy Brett Beavers testified that he worked for the Jefferson Parish Sheriffs Office and was assigned to the First District Patrol Division. On March 4, 2012, he was a detective assigned to the homicide division when he investigated | ^defendant in relation to an incident at 116 Daffodil. After receiving a call that someone had been shot, Deputy Beavers re *852 sponded to the scene, where other police personnel were already present. He began notifying his supervisors of the crime, and spent approximately thirty to forty-five minutes on the scene. While back at the detective bureau, Deputy Beavers received phone calls that witnesses to the crime had been located and that several statements were going to be taken. These witnesses included the Green/Fleming children, the Jensen family, Joyce Moore and the Payne family. After obtaining information regarding the witnesses, Deputy Beavers met with defendant.
Defendant agreed to speak with Deputy Beavers, at which time a Jefferson Parish Rights of Arrestee or Suspects Form was reviewed with defendant. Defendant placed her initials next to every right she was provided with, indicating that she understood and waived it. Among those rights explained to her was the right to have an attorney present during questioning. During the “pre-interview,” defendant disclosed that she was married to the victim but had recently separated from him and acquired another residence in New Orleans. On the date of the incident, she was dropping off her young child so that the victim could watch him during her night shift. While at the home, she and the victim began to argue about “possible infidelity.” Defendant claimed that the victim followed her outside when she tried to leave and took the keys to her vehicle. The two then went back inside where more arguing, as well as some pushing and shoving, took place. When defendant left the home and ran to a nearby corner stop sign, the victim told her that she did not have to leave. It was decided that defendant and the victim would switch cars and, at that time, the victim and defendant began removing items from the respective vehicles they had been driving. The victim told defendant that she could not have a purse that she pulled from the car. Defendant had also retrieved a |7handgun from the trunk that had been placed there earlier that day by a friend. Defendant stated that a “tug-of-war” ensued when the victim grabbed the purse. The whole time, defendant was holding a weapon in her right hand while her left hand was on the purse. During the struggle for the purse the gun discharged and she realized that her husband had been shot. She then ran inside to retrieve a cordless phone and dial 9-1-1, following which she waited for an ambulance and other people to get there.
Defendant’s second interview with Deputy Beavers was recorded on micro-cassette. Defendant also signed a consent form to allow Deputy Beavers to search her cell phone and review her text messages, but nothing of evidentiary value was found. When interviewing defendant, Deputy Beavers noted that defendant had a tear in her blouse. Defendant advised Deputy Beavers that while she and the victim argued during their marriage, she did not indicáte that there was ever physical violence that warranted medical attention or police intervention. After his interview with defendant, Deputy Beavers drafted an arrest warrant, which was signed by a commissioner. Deputy Beavers did not observe any injuries to defendant while speaking with her at the detective bureau.
On .cross-examination, Deputy Beavers testified that, based upon his interview with defendant and other sources of information, he did not believe that the shooting of the victim was accidental. Deputy Beavers testified that his police training was such that he could discharge his weapon if someone tried to gain possession of it.
During re-direct examination, Deputy Beavers clarified that his training was also to point a loaded weapon away from un *853 armed persons, unless trying to determine whether the person is armed.
| sDavid Michael Cox testified as an employee of the Jefferson Parish Sheriffs Office Regional DNA Lab, where he worked as a forensic DNA analyst. He described the process through which DNA is analyzed, and he described his work on the instant case, for which he wrote a DNA report. In connection with this case, he received swabs from the grip and trigger of a Glock 17 pistol, suspected blood from a purse, and reference samples from defendant and the victim. The swabs on the purse came back negative for blood. The swabs from the Glock pistol indicated that there was DNA from at least three individuals. Defendant’s DNA was excluded from the DNA mixture while the victim’s DNA could not be excluded. Cox described the concept of “transferability” which, with respect to DNA, means that a one person could touch a second person and then an object; the result would be that the second person’s DNA could be found on the object.
Allison Murtha testified that she was the manager of the R.J. Lee Group, a materials analysis company, and she was admitted as an expert in the area of gunshot residue analysis. Murtha stated that her company provided a particle extraction on a purse. Both the inside and the outside of the purse were tested for gunshot residue. The report generated from those tests indicated that there was one gunshot residue particle on the inside of the purse and two confirmed gunshot residue particles on the outside of the purse. Murtha explained that if gunshot residue is present on someone’s hands, it would be possible for that person to touch another item and transfer the gunshot residue.
On cross-examination, Murtha explained that the gunshot residue on the purse in this case could have come from the purse either being in the proximity when the firearm was discharged or from coming into contact with something that previously contained gunshot residue.
|flDr. Dana Troxclair testified that she was a forensic pathologist for the Jefferson Parish Coroner’s Office, where she performs autopsies to determine the cause and manner of death. Dr. Troxclair performed an autopsy on the victim on March 5, 2012, and her report indicated that the victim had a single gunshot wound to the left lateral chest area. The gunshot entered through the sixth rib on the left side and penetrated the victim’s left lung, his heart, his aorta and his right lung, and then perforated the seventh rib on the right side. There were no exit wounds on the body. There was also a scratch on the body that appeared to have been caused around the time of death. A projectile was recovered from the body. The cause of death was a’gunshot wound to the chest and the classification of death was homicide. Dr. Troxclair opined that the victim would not have had time to speak prior to his death. A toxicology was performed on the victim which showed no drugs in his blood or urine, and a .01 alcohol level, which indicated one drink or less.
Dr. Troxclair determined that the gunshot wound was an intermediate range, which means the shot came from a distance between a few inches to two to three feet. In an autopsy photograph of the victim, particles from the gun known as “stippling” can been seen on the body near the wound and on his forearm, where the gunpowder actually burned the skin.
Deputy Christopher Rivers testified that he was the custodian of records for the data compilations of inmate phone calls made from the Jefferson Parish Correctional Center (“JPCC”). In response to a subpoena, Deputy Rivers provided a pin number for defendant, a printed list of *854 phone calls made by defendant, as well as a CD containing the actual phone calls. Deputy Rivers listened to specific calls on those CDs identified by the State, and testified that the CDs accurately reflect the calls maintained on the JPCC system.
|10On cross-examination, Rivers clarified that the calls were automatically recorded, and that the specific calls were retrieved at the request of the District Attorney’s Office.
Sergeant Joel O’Lear testified that he was employed by the Jefferson Parish Sheriffs Office Crime Laboratory where he conducts physical comparisons as a firearms and tool mark examiner. Sergeant O’Lear’s office prepared two reports in connection with this case, both were scientific analysis reports. His office was given a Glock pistol, Model 17, 9-millimeter caliber, and a 9-millimeter caliber fired cartridge case to test. O’Lear’s office could not match the projectile provided to him to a particular weapon, but concluded that it came from a plume and rifle barrel with the same characteristics as a Glock 17. With respect to the fired cartridge case, O’Lear’s office concluded it was fired by the firearm provided to his office for testing. An operability test was performed, during which Sergeant O’Lear attempted to get the firearm to accidentally discharge; every attempt to make the weapon malfunction was unsuccessful.
On cross-examination, Sergeant O’Lear stated that it was possible if one’s finger was on the gun’s trigger guard and the finger slipped onto the trigger during a struggle, that there could be enough force to discharge the firearm.
Major Robert Anthony Donnelly, III, testified that he was academy director and chief instructor of the training division for the Orleans Parish Sheriffs Office. Defendant attended his academy, where she received instruction in firearms. As part of that training, defendant was taught about the “force continuum” which instructs which level of force is appropriate to certain threat levels. Major Donnelly explained that the academy taught gun safety techniques, which included pointing the gun in a safe direction with your finger off the trigger whenever you have a weapon in your hand. Defendant spent five hours a day for a full week training to l^fire a weapon. Training also included trying to create distance if an individual is trying to go for your weapon.
Defendant was the sole defense witness to testify at trial. She said that she and the victim, Nicholas Houston, started dating seriously in January of 2007 and got married on April 4, 2009. Defendant and Houston lived at .116 Daffodil. She worked at the Orleans Parish Sheriffs Office from November of 2009 until her arrest. Defendant left the family home in November of 2011 following an argument with Houston. She returned to the home through the holidays at the end of the year and left again in January of 2012. She received a Louis Vuitton purse from Houston for her birthday in February of 2012.
On March 4, 2012, defendant was at Harrah’s Casino with her friend, Gerard Golden after driving there in the grey BMW. Prior to entering the casino, Golden placed his service weapon in the trunk of defendant’s car. After defendant left Har-rah’s, she and Golden picked up her son, Nicholas Jr., to bring to his father, Houston. Defendant dropped off Golden at a Brothers corner store prior to dropping off Nicholas, Jr. She arrived at the house on Daffodil and parked in the driveway. Defendant testified that shortly after arriving, Houston met her in the hallway and asked her why she had not been answering her phone. She claimed that when she tried to leave in her vehicle that he took her phone and keys out of the ignition *855 before going back inside the house. Defendant stated that Houston attempted to unlock her phone but that she would not give him her password, following which he pushed her, tore her clothes and attempted to choke her while in the bedroom. Houston broke the cordless phone after defendant said she would call police. Defendant ran from the house to the corner of Daffodil and Buttercup. Defendant said that Houston asked her if she wanted to leave, to which she replied that she did. Houston then told defendant that if she wanted to leave that she would 112have to take her car. The two proceeded to the house and agreed to exchange items from one car to another. Defendant did not see any children from the neighborhood close by. She reached inside of the backseat of the BMW to retrieve her purse, then went to the trunk of the same ear and removed Golden’s gun. Houston was standing between the two cars, retrieving items from a 1998 Mirage, defendant’s car. Defendant said that she had her entire hand wrapped around the grip of the gun and did not have any fingers on the trigger guard. The purse was in her left hand and the gun was in her right hand. Defendant attempted to get into her car through the driver’s side but the door was locked, so she attempted to enter through the passenger side. She denied waving the gun or threatening Houston while walking around the back of the car. Defendant said that when she walked between the cars, Houston told her that he wanted her to give the purse back, but she refused because her valuables were in there. The two grabbed the purse back and forth, and defendant believed that she was being overpowered. Defendant tried to get a better grip on the purse at which time the gun went off. She said that she could have pulled the trigger. Houston had his hand on the gun at the time it discharged. He told defendant that he had been shot and then fell to the ground. Defendant denied intentionally shooting Houston and claimed she acted in self-defense. She called 9-1-1 when Houston • stopped breathing. Defendant brought the gun into the house and ejected the slide on her gun, then returned it to her purse which she then placed on the.hood of her car. She testified that the only statement she made to Deputy Bradley was that she and Houston were “tussling over the purse, and the gun went off.” Deputy Bradley asked defendant to sit in the back of the police car. She was not handcuffed and had her cell phone, which she used to call Houston’s aunt. Defendant was transported from Daffodil to the Detective Bureau, where she gave a statement to Detective Beavers. She was incarcerated in Jefferson Parish and 11splaced in solitary confinement for her own protection due to her status as a criminal sheriffs deputy in Orleans. She spoke on the phone to Gerard every day, and he was assisting her in contacting her family and attorneys.
An attorney, Lon Burns, went to visit defendant in jail the day after she was arrested. Burns explained to defendant the crimes of negligent homicide and second degree murder, and told her that she needed to “show remorse.” Burns further explained that he had a client who did not show remorse and received a life sentence in prison. Defendant said that the recording of her discussion that negligent homicide was a better outcome than manslaughter or second degree murder was because of what Burns had told her. She said that she did not intentionally try to kill Houston and did not want him to die that day.
On cross-examination, defendant denied being in a relationship with Gerard Golden at the time she shot Houston. Defendant did not tell police that Houston had tried to choke her prior to the shooting. Defen *856 dant did not disagree that the children witnessed a verbal altercation and saw defendant taking a gun out of her trunk, but she denied that Houston accused her of cheating on him while the two were in the driveway. She denied waving the gun at Houston. Defendant was also unsure of the angle of the gun when it discharged. She did not report the shooting to 9-1-1 as an accident. Defendant denied giving a statement that indicated she got her purse from her car after the shooting occurred, and testified that any such statement would have been a mistake on her part.

ASSIGNMENT OF ERROR NUMBER TWO

The evidence was insufficient to support a verdict of guilty as charged in that it failed to prove specific intent beyond a reasonable doubt and instead supports only a verdict for negligent homicide or, in the alternative, manslaughter.

¿DISCUSSION

Defendant raises two assignments of error. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Miller, 06-451, p. 6 (La.App. 5 Cir. 10/31/06), 945 So.2d 773, 778-79. If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id.
Defendant argues that the State failed to prove that the killing was done with specific intent, and the evidence supports only the responsive charge of negligent homicide. She argues that the single, fatal gunshot occurred during a dispute, and her heartfelt reaction to the shooting supports her position that the shooting was an accident. In the alternative, defendant argues that the evidence supports only the responsive verdict of manslaughter because her decision to brandish the firearm was a “heat of blood” mitigatory response to the actions and words of the victim.
Conversely, the State argues that there was sufficient evidence to convict defendant of second degree murder because while defendant testified the gun “went off’ during a struggle with a purse, multiple eyewitnesses testified that defendant was waving the gun prior to the weapon’s discharge.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is “whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” See State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Smith, 12-247 (La.App. 5 Cir. 12/11/12), 106 So.3d 1048, writ denied, 13-0494 (La.7/31/13), 118 So.3d 1120; State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Smith, 12-247 at 6, 106 So.3d at 1053; State v. Harrell, 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019. “Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.” Smith, 12-247 at 7, 106 *857 So.3d at 1053; State v. Kempton, 01-572 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722. “The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” Smith, 12-247 at 7, 106 So.3d at 1053. See also La. R.S. 15:438.
When the trier of fact is confronted by conflicting testimony, weight of the testimony rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Mitchell, 09-996 (La.App. 5 Cir. 5/25/10), 40 So.3d 1122, writ denied, 10-1557 (La.10/21/11), 73 So.3d 370. See also State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). It is therefore, not the “function of the appellate court to assess the credibility of witnesses or to reweigh the evidence absent impingement on the fundamental due process of law.” Mitchell, 09-996 at 8, 40 So.3d at 1127. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by a defendant offers an exculpatory explanation of events. Id. Rather, the reviewing court must determine |1fiwhether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. Id. See also State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83.
Here, defendant was convicted of second degree murder under La. R.S. 14:30.1, which is the killing of a human being, when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:10(1) provides that: “[sjpecific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” State v. Deweese, 13-293, pp. 9-10 (La.App. 5 Cir. 10/30/13), 128 So.3d 1186, 1192. Specific intent to kill can be inferred from the intentional use of a deadly weapon, such as a knife or a gun, as well as from the extent and severity of the victim’s injuries. Deweese, 13-293 at 10, 128 So.3d at 1192; State v. Riley, 11-673, p. 11 (La.App. 5 Cir. 3/13/12), 90 So.3d 1144, 1150, writ denied, 12-0855 (La.9/28/12), 98 So.3d 828.
In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. Bauman, 08-1169 at 11, 15 So.3d at 185; State v. Francois, 13-616, p. 14 (La.App. 5 Cir. 1/31/14), 134 So.3d 42, 52, writ denied, 14-0431 (La.9/26/14), 149 So.3d 261. Manslaughter is defined, in relevant part as, “A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.” La. R.S. 14:31. The mitigating factors of provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. State v. Deal, 00-434, p. 5 (La.11/28/01), 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002); Bauman, 08-1169 at 11, 15 So.3d at 185; Francois, 13-616 at 14, 134 So.3d at 52.
In the instant case, there were multiple witnesses to the shooting of the victim. It was undisputed that defendant deliberately went into the trunk of the car to retrieve the gun. Many of the child witnesses heard defendant and the victim *858 “fussing” or arguing and “cursing at each other,” with some children hearing defendant declaring, “[djon’t come out that door or I’m going to shoot you,” “[y]ou ain’t leaving me” and “I will shoot you.” Most of the witnesses testified that defendant was waving and swinging the gun around, and some witnesses testified that the victim was attempting to calm defendant down and retrieve the gun from her. One witness testified that defendant “pointed” the gun, and the victim “backed up,” and when defendant said, “I will shoot you,” the man raised his hands in the air, and defendant shot him.
Defendant initially reported that the gun discharged in the purse, but on the scene Deputy Bradley “took a look at the purse” — without touching or manipulating it — and did not observe any holes or anything to indicate a gun had discharged in the purse. The jury also heard evidence that the weapon was tested to determine if it would accidently discharge, and “[ejvery attempt to make the weapon malfunction was unsuccessful.”
Defendant was permitted to offer her version of events to the jury, where she discussed the alleged accidental nature of the shooting. The jury additionally heard the witnesses testify as to defendant’s apparent regret subsequent to the shooting. However, after considering the evidence, the jury evidently believed the State’s witnesses and rejected defendant’s version of events, even after considering the witnesses’ testimony that defendant was apologetic after the incident. “The credibility of witnesses is within the sound discretion of the trier of fact, who may [ 1Raccept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal.” State v. Abdul, 11-863, p. 12 (La.App. 5 Cir. 4/24/12), 94 So.3d 801, 811-12, writ denied, 12-1224, 12-1226, (La. 10/12/12), 99 So.3d 41; State v. Rowan, 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
At trial, the jury was presented with conflicting testimony regarding the events surrounding the victim’s death and made a credibility determination. Based on our review of the record, we find that the jurors did not unreasonably or irrationally reject the defense’s construction of the evening’s events, and any rational trier of fact could have found that the State proved the essential elements of La. R.S. 14:30.1 beyond a reasonable doubt. Multiple witnesses testified contrary to defendant’s version, stating that she did point the gun at the victim and told the victim she would shoot him. While defendant may have expressed remorse after the fact and cooperated with police regarding the investigation, the jury still opted to believe the witnesses who testified as to what they saw regarding the circumstances of-the victim’s death. In considering defendant’s actions of deliberately brandishing the firearm, swinging the gun around, and warning the victim that she would shoot, as well as the extent of the victim’s injuries resulting in his death, we find that the evidence was sufficient under Jackson to support the jury’s finding that defendant had specific intent to kill or inflict great bodily harm on her husband. Therefore, the evidence supports a guilty verdict of second degree murder.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER ONE

It was error to deny the Motion to Suppress Statement where the evidence showed that the officer placed the defendant in custody in the rear seat of a marked |13police unit and interrogated her there without first advising her of • her rights pursuant to Miranda.

*859
DISCUSSION

On appeal, defendant argues that once she was secured in the rear seat of the police vehicle, she was in custody, she should have been advised of her rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to the questioning. Defendant argues that the State attempted to “shoe-horn” Deputy Bradley’s questioning of her into the “merely intended for clarification” language of State v. Lane, 414 So.2d 1223, 1225-26 (La.1982) and State v. Fernandez, 96-2719, 712 So.2d 485, 487 (La.4/14/98), when there was nothing that needed clarification.
The State asserts that defendant was not “in custody” when she answered Deputy Bradley’s questions, as she had only been sequestered from the crime scene for a few minutes, she was not handcuffed, and she had access to her cell phone, which she in fact used. The State also argues that even if defendant was “in custody,” the introduction of her statement to Deputy Bradley was harmless error, as the jury heard the evidence anyway.
Deputy Bradley’s testimony at the suppression hearing was consistent with his trial testimony. He testified that he reported to the scene and asked defendant what happened, and “she told [him] that she did it.” Deputy Bradley performed a “pat search” on defendant and placed her in the back of his marked police unit, which had a “cage.” Deputy Bradley saw another female and went to talk to her, before returning to defendant and asking her where the weapon was. Defendant was not cuffed at the time and the car door was shut, so he opened the car door to inquire about the location of the firearm. Deputy Bradley testified that the Hnquestions he asked defendant during that time period were to secure the scene and for clarification, as he was unsure if there was another shooter or victim involved.
On cross-examination, Deputy Bradley testified that he did not advise defendant of her rights because he did not determine she was the suspect or that she was under arrest at the moment, and he just wanted clarification on what “I did it” meant. Deputy Bradley asked defendant what happened, and defendant said she and Houston were arguing, there was a struggle, she swung the purse, and then the gun went off. On re-direct examination, he testified that defendant was not in handcuffs, and the door to the unit was open as they were talking.
The trial judge found that based on the totality of the circumstances, the statement was not the result of a custodial interrogation, and the officer was merely seeking clarification of an earlier voluntary statement as part of his investigation.
Before introducing a defendant’s statement into evidence, the State must show that the statement did not result from fear, duress, intimidation, menace, threats, inducements, or promises. La. R.S. 15:451. See also State ex rel. A.B., 07-907, p. 7 (La.App. 5 Cir. 3/25/08), 983 So.2d 934, 939. At a hearing on a motion to suppress a statement, the State bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the statement. La.C.Cr.P. art. 703.
A determination of voluntariness is made on a case-by-case basis, depending on the totality of the facts and circumstances of each situation. State v. Gross, 12-73, p. 19 (La.App. 5 Cir. 2/21/13), 110 So.3d 1173, 1185, writ denied, 13-0661 (La.10/25/13), 124 So.3d 1091. The admissibility of a confession or statement is a determination for the trial judge and the judge’s conclusions on the credibility and weight of the testimony relating to the *860 voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. Id.; State ex rel. A.B., 07-907 at 8, 983 So.2d at 939; State v. Terrick, 03-515, pp. 10-11 (La.App. 5 Cir. 9/30/03), 857 So.2d 1153, 1159-60, cert. denied, 03-3272 (La.3/26/04), 871 So.2d 346. Testimony of the interviewing police officer alone may be sufficient proof that a defendant’s statements were freely and voluntarily given. Gross, 12-73 at 19, 110 So.3d at 1185; Arias-Chavarria, 10-116, 49 So.3d at 433. When reviewing the correctness of the trial court’s ruling on the motion to suppress, the appellate court is not limited to evidence adduced at the hearing on the suppression motion, but may also consider pertinent evidence given at trial. State ex rel. A.B., 07-907 at 8, 983 So.2d at 939; State v. Manson, 01-159, p. 6 (La.App. 5 Cir. 6/27/01), 791 So.2d 749, 755, writ denied, 01-2269 (La.9/20/02), 825 So.2d 1156.
Spontaneous and voluntary statements, not given as a result of police interrogation or compelling influence, are admissible in evidence without Miranda warnings even where a defendant is in custody. State v. George, 371 So.2d 762 (La.1979), cert. denied, 444 U.S. 953, 100 S.Ct. 430, 62 L.Ed.2d 325 (1979); State v. Thornton, 351 So.2d 480 (La.1977); State v. Thomas, 310 So.2d 517 (La.1975); State v. Higginbotham, 261 La. 983, 261 So.2d 638 (1972); State v. Hall, 257 La. 253, 242 So.2d 239 (1970).
The Louisiana Supreme Court has consistently held that “Miranda warnings are not a pre-requisite to admissibility of statements taken by officers during noncustodial, general, on-the-scene investigations, conducted to determine the facts and circumstances surrounding a possible crime, absent a showing that the investigation has passed the investigatory stage and has focused on the accused.” State v. Weeks, 345 So.2d 26, 28 (La.1977) (emphasis as found in original). See also State v. Anderson, 332 So.2d 452 (La.1976); State v. Ned, 326 So.2d 477 (La.1976); State v. Shirley, 08-2106, pp. 8-10 (La.5/5/09), 10 So.3d 224, 229-30.
1a2Here, defendant takes issue with the cases both the State and the trial judge relied on when denying the motion to suppress. The trial judge relied on footnote two in Fernandez, 712 So.2d at 487 n. 2, when - denying the motion to suppress statement and finding that defendant’s statement was not the result of a custodial interrogation. That- footnote referred to State v. Lane, 414 So.2d 1223 (La.1982), where the defendant, an adult male, was arrested for the first degree murder of a young woman. While being booked, the defendant stated to the officer, “All I did was top her in the bathtub.” The officer replied, “What do you mean by topping her ... did you have sex with her?” Fernandez, supra. The defendant responded, ‘Tes.” Id. The Louisiana Supreme Court concluded that the officer’s question was merely intended for clarification of a voluntary statement, as opposed to interrogation. Id. The statement by the defendant that he “topped” the victim in the bathtub was clearly spontaneous and voluntary and was not provided as a result of compelling influences. Lane, 414 So.2d at 1226. Thus, the court found that the operative colloquy between the detective and the defendant did not constitute custodial interrogation in violation of Miranda. Id.
Here, as in Lane, Deputy Bradley asked defendant “what happened,” and he received a brief answer, to which he asked for further clarification as well as the location of the gun. The trial judge did not find this to be an interrogation, but rather an attempt to clarify the initial voluntary statement.
*861 In State v. Weeks, 345 So.2d 26, 28 (La.1977), officers arrived at the scene of a shooting and had only been informed that a killing had taken place. The officers inquired as to whether anyone knew what happened, and the defendant relayed that she was present with the victim when he was killed. Id. The defendant offered other statements in response to general investigatory questioning and sometimes offered spontaneous statements. Id. The court concluded that the ^investigation did not begin to focus on the defendant as a possible offender until she provided those statements, and at that time the officers were not compelled to advise her of her Miranda rights. Id.
Similarly, in this case, Deputy Bradley arrived on the scene with limited information that someone had been shot. He inquired as to what happened to which defendant said, “I did it.” While Deputy Bradley did place defendant in his patrol car, he testified that the questions he asked defendant during that time period were to secure the scene and for clarification, as he was unsure if there was another shooter or victim involved. We find that the questions of where the firearm was located and the question of what happened were clarification questions following up on the voluntary statement previously made and were general, on-the-scene investigatory questions to determine the circumstances surrounding the possible crime.
In none of the cases relied upon by defendant, did a court suppress spontaneous or voluntary information provided by the accused prior to being Mirandized. In fact, in George, supra, and United States v. Patton, 517 Fed.Appx. 400 (6th Cir.2013), the courts permitted volunteered statements made by the defendants while in custody, and in George, the court additionally did not suppress the clarification statements made by the defendant subsequent to questions asked by police officers. We find little merit to defendant’s reliance on Thornton, supra, because it is not clear from the case whether the defendant was placed under arrest after the discovery of evidence for investigation of a crime, and there is no mention of clarification questions being asked or answered. We also find that the voluntary statements elicited from Deputy Bradley were clarification questions that were in the course of general, on-the-scene investigations, conducted to determine the facts and circumstances surrounding a possible crime. Accordingly, we conclude that | j,4the Miranda rights were not required prior to defendant’s statements to Deputy Bradley.
This assignment merits little consideration.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990). Our review reveals no errors patent in this case.

CONCLUSION

Defendant’s conviction and sentence for second degree murder are hereby affirmed.

CONVICTION AND SENTENCE AFFIRMED.

. It is noted that the transcript of March 20, 2013, indicated “Day 2” of the trial, opening *850 statements were made on that date.

.While Jensen did not identify the street as Daffodil Lane, the full name of the street was disclosed later in the record. The record also indicates that this street is located in the Waggaman area of Jefferson Parish.

. Moore identified defendant in open court.

. These witnesses were: Hailey Jensen, Hannah Jensen, Jaimari Fleming, Jeanika Fleming, Jenai Green, Jeanara Fleming, Keira Kimbrough, §anii Payne, Jimyria Payne and Jimmae Payne.

. Deputy Bradley identified defendant in open court.