STATE OF LOUISIANA

VERSUS

FERNANDO H. DAROCHA

NO. 20-KA-176

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 18-7472, DIVISION "I"
HONORABLE NANCY A. MILLER, JUDGE PRESIDING


January 27, 2021


**HANS J. LILJEBERG**
**JUDGE**


Panel composed of Judges Fredericka Homberg Wicker,
Robert A. Chaisson, and Hans J. Liljeberg


**<u>AFFIRMED</u>**
  **HJL**
  **FHW**
  **RAC**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
Honorable Paul D. Connick, Jr.
Thomas J. Butler
Anne M. Wallis
Lynn Schiffman
Lindsay L. Truhe

COUNSEL FOR DEFENDANT/APPELLANT,
FERNANDO H. DAROCHA
Cynthia K. Meyer

**LILJEBERG, J.**

Defendant appeals his conviction and sentence for second degree murder, arguing that the trial court erred by denying his motion to suppress statements. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On November 29, 2018, defendant, Fernando H. Darocha, with charged by grand jury indictment with second degree murder, in violation of La. R.S. 14:30.1. He pleaded not guilty at his arraignment. On January 23, 2019, defendant filed a motion to suppress statements. After a hearing, the trial court denied the motion on May 20, 2019.

On September 19, 2019, at the conclusion of defendant's trial, a twelve-person jury unanimously found him guilty as charged. On September 23, 2019, the trial court sentenced defendant to life imprisonment at hard labor to be served without the benefit of parole, probation, or suspension of sentence.

At trial, Detective Ariel Larce of the Gretna Police Department testified that on July 31, 2018, around 11:20 a.m., she responded to a call from 1901 Lafayette Avenue, Apartment 510 in Gretna about an eleven-month-old, later identified as Aaron Avila, who fell from a bed and hit his head. She stated that she arrived at 11:30 a.m. and first passed the apartment in her haste. When she looked in her rear view mirror, she saw a white male, later identified as defendant, flagging her down and pointing in the direction she had passed. She stated that defendant was bare chested, barefoot, and wearing black sweatpants or joggers. Detective Larce said she then saw a female, later identified as the baby's mother, Jennifer Avila, holding a baby that appeared "almost bluish gray compared to her skin tone."

Detective Larce testified that she sped back towards Ms. Avila, got out of the car, and ran to Ms. Avila. The baby, Aaron, only had a diaper on and was blue and not moving. She stated that Aaron's head was swollen and she thought he was

dead, so she asked Ms. Avila if he was alive and breathing, to which she responded that he was breathing. Detective Larce indicated that the paramedics arrived and she quickly brought Aaron to them. Angela Hunter, who is a paramedic and a police officer, attempted to ask Ms. Avila what happened, but Ms. Avila stated that she did not speak English. Detective Larce testified that she then ran to her patrol unit to call Laura Duran, the secretary for the Gretna Police Department, because she is "very fluent in Spanish."

Detective Larce, with the assistance of Ms. Duran on speaker phone, learned from Ms. Avila that Aaron fell backwards from a high bed onto a hardwood floor and hit his head. Due to his injuries, Aaron was taken to the hospital. Detective Larce escorted the ambulance to the hospital. When she opened the back of the ambulance upon arrival, Aaron's "color was tan, he was crying, [and] he was kind of squirming a bit." She stated that his head appeared bigger than when she first took him from Ms. Avila.

While she was at the hospital waiting to hear from the doctors, Detective Larce contacted Sergeant Roland Kindell because she had not had an opportunity to verify that Aaron could have fallen from a high bed onto a hardwood floor as she had been told. While waiting for Sergeant Kindell to verify the information, doctors told her that the baby had multiple skull fractures that could not have come from one fall. She testified that based on that information, the investigation shifted to a criminal investigation.

Detective Larce testified that she transported Ms. Avila to the police station for an interview. She indicated that when they arrived, defendant was there with Ms. Avila's four-year-old son, Santiago. She observed that Santiago and Ms. Avila communicated in English. Detective Larce testified that she remained in communication with Aaron's doctors and that she was at the hospital when Aaron died on his first birthday, August 3, 2018.

Ms. Hunter testified that she was working with EMS on July 31, 2018, when she was dispatched to a call at 1901 Lafayette Street in Gretna regarding an eleven-month-old that fell off of a bed. She stated that she and her partner, Brooke Treadaway, arrived at the scene at 11:30 a.m. and saw Deputy Larce holding the baby. Ms. Hunter testified that she saw a "thin built male with gray hair walking through the parking lot" and the mother standing outside of the apartment. She indicated that Deputy Larce handed the baby to Ms. Treadaway, and the baby was brought to the back of the vehicle. She described the baby as limp, pale, and not making any noise. She stated that he only made a sound when they touched the back of his head as they put on an oxygen mask. She felt the back of his head while doing so and described it as, "crunchy, a mushy feeling."

Ms. Hunter testified that it is important for EMS to know the facts and circumstances surrounding how a patient was injured in order to have an idea as to how to treat them and what to look for. She stated that they attempted to speak to the mother, but she would not speak English, so Deputy Larce got an interpreter on her phone. Through the interpreter, the mother told them that the child fell off of a bed onto a hardwood floor and that she gave the child a bath then waited about thirty minutes or so before calling 9-1-1. Ms. Hunter testified that she transported the child to the hospital and, when they arrived, he was still not responsive and his color was poor. She stated that in her fifteen years as an EMS responder, she had never seen this type of injury from a child falling from a two-foot-high bed.

Sergeant Roland Kindell with the Gretna Police Department testified that on July 31, 2018, he was notified of an investigation regarding a baby who fell and was at the hospital. He stated that Detective Larce responded to a medical call and then went with EMS officers to the hospital. At the hospital, she notified him of the baby's injuries and asked him to assist. Sergeant Kindell testified that he proceeded to the apartment at 1901 Lafayette, Apartment 510. Crime scene was

called to the apartment and photographs were taken. Crime scene also collected a store receipt. Sergeant Kindell stated that the bedroom floor was carpet, not a hard surface, and that the bed was not high. He stated that he informed Detective Larce of his observations and notified Sergeant Louis Alvarez of the investigation.

Sergeant Ashton Gibbs with the Gretna Police Department testified that he was notified by Sergeant Alvarez of the investigation on July 31, 2018. He stated that he took over as lead detective and went to the hospital. Once there, he spoke to Detective Larce and attempted to speak to Ms. Avila but encountered a language barrier. Sergeant Gibbs learned from the doctors that Aaron had multiple skull fractures. He stated that while he was at the hospital, other officers were at the apartment where the incident occurred. He was informed by those officers that there was not a high bed or wood floors at the apartment, which did not corroborate what he had been told. Sergeant Gibbs presented a photograph of the bed in the apartment to the doctors and was told by the doctors that it was not likely that Aaron's injuries were sustained from that bed. At that time, he was not informed of any injuries in the bathroom.

Sergeant Gibbs stated that after leaving the hospital that day, he went to the Gretna Police Department to interview Ms. Avila and defendant, who were both already there. He testified that he first observed Sergeant Alvarez interview defendant from another room. After an hour, Sergeant Alvarez stopped his interrogation, and Sergeant Gibbs went to interview Ms. Avila, whom he described as tearful and nervous at times. Sergeant Gibbs stated that an interpreter was present, and she was read her rights. During that interview, Ms. Avila stated that she was at the apartment changing Santiago in a closet when she saw Aaron fall off of the bed and hit his head. He said that he stopped her interview because her statement was inconsistent with Aaron's injuries and with defendant's statement.

Sergeant Gibbs testified that Sergeant Alvarez then went to speak to defendant again. After defendant's second statement, Sergeant Gibbs again spoke to Ms. Avila. Sergeant Gibbs testified that during her second interview, Ms. Avila provided another statement that he was able to corroborate with surveillance video from a local store that showed Ms. Avila enter and exit the store with a grocery bag. He said she also indicated that Aaron fell in the bath and hit his head on the faucet. Sergeant Gibbs stated that defendant then gave a third statement that was inconsistent with his prior statements but consistent with Ms. Avila's second statement; both were then arrested.

Sergeant Gibbs testified that while the interviews were taking place, another officer obtained a search and seizure warrant for the apartment in Gretna. Sergeant Gibbs then went to the apartment where measurements and photographs were taken. He stated that the bed was two feet and two inches high. Sergeant Gibbs testified that he obtained surveillance video from the Budget Saver for July 31, 2018, depicting Ms. Avila entering the store at 10:33 a.m. and exiting with a white grocery bag at 10:40 a.m. In the apartment, he located a purchase receipt from the Family Dollar that was time stamped 10:59 a.m. that morning. Sergeant Gibbs stated that the video and receipt corroborated that Ms. Avila was away from the apartment from at least 10:32 a.m. to 10:59 a.m.

Sergeant Gibbs stated that he went to the hospital on August 3, 2018, and he learned that Aaron died that day from his injuries. Sergeant Gibbs testified that he obtained Aaron's medical records, which showed a diagnosis that included a fractured skull and anoxic brain damage. He stated that the records indicated Aaron suffered from: blunt force trauma, diffuse axonal brain injury, hematomas, suspected child abuse, craniectomy, brain herniation, occipital fractures, depressed skull fracture, other fractures to his skull, hemorrhages of his eyes, and principal/non-accidental traumatic injury to the child. Sergeant Gibbs concluded

that based on the investigation, defendant was the only person left alone with Aaron prior to his fatal injuries.

Sergeant Louis Alvarez with the Gretna Police Department testified that an investigation began on July 31, 2018, regarding an injured baby. He stated that Sergeant Gibbs was sent to the hospital while he proceeded to the apartment on Lafayette Street. Sergeant Alvarez stated that defendant and Santiago were present when officers arrived, and he attempted to communicate with defendant, but he "sounded like he spoke Spanish." Sergeant Alvarez contacted another officer to bring Ms. Duran, a Spanish speaking secretary, to translate because time was important. He testified that defendant told him that he laid Aaron on the bed and went to take a shower. Sergeant Alvarez stated defendant told him he then heard a noise and a scream, so he got out of the shower and saw Aaron on the floor.

Sergeant Alvarez stated that Ms. Avila and defendant were later brought to the Gretna Police Department, and he learned of Aaron's injuries from Sergeant Gibbs. Sergeant Alvarez, through Ms. Duran acting as translator, spoke to defendant. He stated that it appeared defendant understood Ms. Duran at the apartment, but he later learned that defendant spoke Portuguese. Defendant made three recorded statements, and the audio was later translated and transcribed by a Portuguese speaker. Sergeant Alvarez stated that he presented defendant with his *Miranda* rights and the first interview began at 2:08 p.m. that afternoon. The interview was played for the jury.

Sergeant Alvarez stated that in defendant's first statement, he mentioned giving Aaron a bath but did not indicate that any injuries occurred in the bathtub. Sergeant Alvarez testified that he asked repeatedly if anything happened in the bathroom, but defendant denied any injury occurring in the bathroom. He stated that defendant instead said he put Aaron on the bed and talked about him falling off of the bed. Sergeant Alvarez testified that later in the interview, defendant

stated that Aaron hit his head on a TV stand. Sergeant Alvarez testified that defendant stated that he was never alone with the children, but the evidence from the Budget Saver and the Family Dollar refuted that statement. The first interview ended at 3:05 p.m.

Sergeant Alvarez testified that Sergeant Gibbs then spoke with Ms. Avila. Afterwards, Sergeant Alvarez conducted a second interview with defendant, which was also recorded, translated, and played for the jury. During that interview, defendant stated that Ms. Avila did not leave the apartment that day. However, Sergeant Alvarez stated that he was able to prove this was a lie and that defendant had the sole care, custody, and control of Aaron while Ms. Avila was away. Defendant later admitted that he was alone with the children when Ms. Avila went to the store. He stated that he gave Aaron a bath, but he denied that any injuries occurred in the bathroom. This second interview concluded, and Sergeant Gibbs again spoke with Ms. Avila. Sergeant Alvarez stated that Ms. Avila's second statement was different than the first and was corroborated by other evidence.

Sergeant Alvarez stated that based on Ms. Avila's second interview, he returned to interview defendant a third time starting at 5:28 p.m. This third interview was also recorded, translated, and played for the jury. Sergeant Alvarez testified that defendant again repeatedly denied anything occurring in the bathroom. Defendant stated that Aaron was fine when Ms. Avila left the apartment. Sergeant Alvarez stated that after he was confronted with Ms. Avila's statement, defendant said that he was alone with Aaron and bathed him, and that Aaron was injured in the bathroom. Defendant also indicated that Aaron's head was swollen. Sergeant Alvarez testified that no version of events from defendant fit with the injuries Aaron sustained or with what the doctors were saying. He also noted that defendant did not ask about Aaron during the entire interview process.

Dr. Jason Wilson, a neurosurgeon, testified that Aaron had multiple skull fractures and that he performed a craniectomy on Aaron on July 31, 2018. He testified that there was blood on the surface of the brain and between the two hemispheres, and his intracranial pressure was extremely high. He indicated that Aaron's skull was fractured on both sides and the extent that the bone was broken up suggested that there could have been an impact on both sides causing the skull to break or possibly a significant impact on the base in the back of the skull.

Dr. Wilson described the craniectomy as removing as much bone as possible and opening the brain's protective covering to relieve intracranial pressure. He stated that typically, the skull comes off in one or two pieces, but because Aaron's skull was very fractured, it came off in several shattered pieces. Dr. Wilson noted that Aaron had a subdural hematoma, which is related to significant force and shaking of the brain. Dr. Wilson stated a child falling and hitting the same spot on the skull in a two-day span on a TV stand, faucet, and a carpeted floor would be inconsistent with Aaron's injuries.

Dr. Neha Mehta testified that she is a medical doctor at Children's Hospital, and she was accepted as an expert in general pediatrics and child abuse pediatrics. Dr. Mehta testified that in her expert opinion, Aaron's injuries were not consistent with a fall out of the bed in the apartment, nor with hitting his head on the bathtub faucet in the apartment, nor a combination of both of those falls. She concluded that his injuries were consistent with multiple impacts to the head and "very high force rapid acceleration, deceleration injury, meaning the head whiplashing." She stated that such force cannot be generated by a child but must come from a "much larger person acting on a much smaller child." Dr. Mehta stated that Aaron's injuries are "highly associated with violent child physical abuse, abusive head trauma."

Dr. Yen Van Vo, an expert in forensic pathology, testified as to the autopsy she performed on Aaron on August 4, 2018. Dr. Vo stated that she determined that the cause of death was multiple blunt force injuries, particularly blunt force injury of the head and neck, and the manner of death was homicide.

Ms. Avila testified that criminal charges were pending against her at the time of trial. She stated that she is the mother of Santiago, age five, and Aaron, who was eleven months old when he died. Ms. Avila testified that in 2018, she lived in Monroe, Louisiana. She and defendant were co-workers for six months, and they were in a relationship for four of those months. Ms. Avila stated that on July 30, 2018, she and her two children left Monroe and picked defendant up in Mississippi. She noted that they were going to Kenner because she needed to get a license plate for her car, and they were going to stay at defendant's brother-in-law's apartment in Gretna. She indicated that when they left Monroe, Aaron had no trouble breathing or walking, and his head was not swollen.

Ms. Avila testified that at the apartment that evening, Aaron was crawling around the television, and when he tried to stand up, he bumped his head on the stand. She said he did not have trouble breathing, walking, or playing afterwards. She indicated that Aaron had no issues eating dinner later and was put to bed. Ms. Avila testified that when Aaron woke up the next morning, he was still breathing and walking normally. She stated that when she left the apartment the next morning to go to the store, defendant and her children were awake and stayed at the apartment. She testified that she went to two stores and made a purchase at the second store, the Family Dollar.

Ms. Avila stated that she arrived back at the apartment and went to the living room where she saw her older son watching TV. She indicated that she then went to where Aaron was on the bed, and he looked like he was sleeping. When she went closer to check on him, she noticed that his lips were purple, and his head

was swollen. Defendant was in the shower at the time. Ms. Avila testified that she screamed, and defendant entered the bedroom. She asked him what happened, and he said he just bathed Aaron; when she asked again, defendant said that when he was bathing Aaron, he fell in the tub. She stated that she then called the police. Ms. Avila testified that before speaking to the police, she again asked defendant what happened, and he said Aaron fell off of the bed. She said she told the police he fell off of the bed because defendant told her to say that.

Ms. Avila testified that she ran outside with Aaron when she heard the ambulance and saw it pass the apartment. She went with Aaron to the hospital and continued to say that Aaron fell from a bed. She testified that she then went to the police station and spoke with officers. She admitted that she lied to the officers by stating that she was there when he fell. Ms. Avila said she lied because she was worried her children would be taken away from her since she left them with someone else. She stated that she eventually told the police the truth because she realized his injuries were serious. Ms. Avila was interviewed twice at the police station. During the second interview, she told them about the incident the night before when Aaron bumped his head on the TV stand and that she was not there when Aaron was injured.

## LAW AND DISCUSSION

In his sole assignment of error, defendant argues that the trial court erred in denying his motion to suppress the statements he made to Sergeant Alvarez. He asserts that the State failed to prove that he was advised of his *Miranda*[1] rights in a language that he could understand and that he made a knowing and voluntary waiver of his rights. Defendant notes that he is a twenty-eight-year-old immigrant from Brazil and had only been in the United States for two years. He states that he informed officers at the apartment that he spoke Portuguese, but they made no

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

attempt then or during his four-hour interrogation period to obtain a Portuguese interpreter. Defendant contends that the interpreter, Ms. Duran, does not speak Portuguese, has no formal training in interpretation, and has not been certified as an interpreter by the courts. He contends that the video shows that he and Ms. Duran had difficulty communicating, but Sergeant Alvarez continued the interrogation despite the language barrier.

Defendant asserts that given the totality of the circumstances, in light of his short time in the United States, the language barriers, and the difficulties in communication during the interrogation, the trial court should have found that there was not a valid waiver of his *Miranda* rights and suppressed his statements. Defendant concludes that had the statements not been admitted, it is likely the jury would not have returned a verdict of guilty to second degree murder and his conviction should therefore be set aside.

The State acknowledges that defendant properly preserved for appeal his claim that he did not validly waive his *Miranda* rights due to the language differences. However, the State asserts that defendant now also argues that Ms. Duran was not an official interpreter and had no "formal training in interpretation and is not certified as an interpreter by the courts." The State argues that this particular claim regarding Ms. Duran's lack of formal training or certification is waived, because it was not argued below or included in the written motion to suppress.

In addition, the State asserts that defendant's claim that he did not understand the rights he was waiving has no merit. The State argues that despite defendant's assertion that he did not understand his *Miranda* rights because they were in Spanish, the record reflects that defendant speaks both Spanish and Portuguese. The State notes that the mother of the victim, with whom defendant had a relationship for four months, speaks Spanish, and they communicated in

Spanish. The State also states that Ms. Duran testified that she was able to communicate with defendant and that he indicated to her that he spoke Spanish. The State further asserts that Louisiana law does not require that a translator be certified. The State argues that it was not error to admit the statements and that even if it had been, such an error was harmless.

Defendant filed a written motion to suppress statements, asserting that any statements taken by the police were taken in violation of his "Constitutional rights, as the officers did not have an arrest or search warrant, and they did not read the defendant his Miranda rights." Defendant further argued that "[a]ny and all statements were taken by the officers and given by the defendant due to the officers' coercion and promises, and consequently, they were not voluntary."

At the hearing on defendant's motion to suppress statements, Sergeant Alvarez testified that he went to 1901 Lafayette Street, Apartment 510, on July 31, 2018. Due to a language barrier, he contacted Laura Duran, who was "a Spanish speaking interpreter who [they] use at the department." He stated that Ms. Duran came to the apartment, and it appeared defendant understood her. Sergeant Alvarez stated that defendant gave them permission to access the apartment, and he was not under arrest or a suspect at that time. Sergeant Alvarez indicated that he again spoke to defendant that same date at the Gretna Police Department, and Ms. Duran was present then as well.

Sergeant Alvarez testified at the hearing that prior to speaking to defendant, he presented defendant with a Rights of Arrestee or Suspect form in English and read through the form with Ms. Duran translating it. He indicated that defendant initialed next to each right and appeared to understand his rights. Sergeant Alvarez stated that defendant signed the form agreeing to waive those rights, and defendant answered his questions. He indicated that he did not force, coerce, or threaten defendant at any time.

Sergeant Alvarez testified that he did not obtain a Portuguese interpreter because he did not initially know that Portuguese was defendant's first language. Rather, he thought it was Spanish. Sergeant Alvarez again stated that it appeared that defendant understood Ms. Duran and that his translated responses made sense in connection with the questions he asked. When asked about Ms. Duran's qualifications, Sergeant Alvarez stated he did not know her qualifications but she was "used in many complex cases within the department."

Ms. Duran testified at the suppression hearing that she worked for the Gretna Police Department and translated as needed. She stated that her first language is Spanish, and she does not speak Portuguese. Ms. Duran stated that she first encountered defendant at the apartment complex and was able to communicate with him in Spanish. She indicated that when she arrived at the apartment, she "could tell he had an accent" and asked him what his first language was. When he told her it was Portuguese, she asked him if he spoke Spanish, and he told her that he did. She stated that she also asked how he communicated with Ms. Avila and he responded, "oh, I speak Spanish." Ms. Duran testified that there was no attempt to obtain a Portuguese interpreter because defendant said he spoke Spanish. She indicated that she asked him several questions at the apartment that enabled her to determine that he spoke Spanish and could understand her.

Ms. Duran further testified that she met with defendant at the Gretna Police Department, and she translated defendant's *Miranda* rights on behalf of Sergeant Alvarez. She stated that she read the rights from a Spanish form and asked defendant if he understood each right after she read it. She indicated that she then had defendant initial by each right if he understood it. She stated that he understood her and communicated with her.

On cross-examination, Ms. Duran acknowledged that she has never translated in a court or been certified by the Louisiana Supreme Court as an

interpreter. However, she stated that she has worked as a supervisor in the radio room at the Jefferson Parish Sheriff's Office, and one of her tasks was to translate Spanish emergency calls. She further stated that she has translated in the radio room at the Gretna Police Department and was the secretary for the Bureau where she was tasked with translating. She testified that she started translating at the sheriff's office at eighteen years old and was thirty-seven at the time she testified. Ms. Duran acknowledged that she has no formal language education.

After considering the testimony and the arguments of counsel, the trial court found that defendant voluntarily waived his *Miranda* rights and gave voluntary statements with no force, threats, coercion, or promises. The trial court stated:

> While the Court notes that Spanish is not Mr. Darocha's primary language or first language, he certainly has communicated in Spanish and has alleged that his main form of communication with Ms. Avila is in Spanish. I have no doubt that this defendant understood his rights and thoroughly waived his rights.

A defendant bears the burden of asserting the basis for his motion to suppress in order to give the State adequate notice so that it may present evidence and address the issue. *State v. Lobo*, 11-51 (La. App. 5 Cir. 10/25/11), 77 So.3d 427, 436, *writ denied*, 11-2586 (La. 3/30/12), 85 So.3d 117. Articulating a new basis for the motion to suppress for the first time on appeal is prohibited under La. C.Cr.P. art. 841, since the trial court would not be afforded an opportunity to consider the merits of the particular claim. *State v. Berroa-Reyes*, 12-581 (La. App. 5 Cir. 1/30/13), 109 So.3d 487, 496 (citing *State v. Harris,* 414 So.2d 325 (La. 1982)). Louisiana courts have long held a defendant may not raise new grounds for suppressing evidence on appeal that he did not raise at the trial court in a motion to suppress. *Berroa-Reyes*, 109 So.3d at 496.

The State argues that defendant waived any argument regarding the translator's qualifications because he did not argue the issue below or include it in his written motion. We agree. Defendant's written motion makes no mention of

Ms. Duran's qualifications and instead focuses on defendant's *Miranda* rights and the voluntariness of his statements. At the hearing, information was elicited regarding Ms. Duran's Spanish abilities, training, and experience. However, defendant did not orally argue that Ms. Duran was unqualified. Because he did not raise this argument in the trial court, defendant waived the argument that Ms. Duran lacked the appropriate qualifications to act as a translator.

The State has the burden of proving the admissibility of a purported confession or statement by the defendant. La. C.Cr.P. art. 703(D); *State v. Arias-Chavarria*, 10-116 (La. App. 5 Cir. 9/28/10), 49 So.3d 426, 433, *writ denied*, 10-2432 (La. 2/25/11), 58 So.3d 460. Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his *Miranda* rights, that he voluntarily and intelligently waived his *Miranda* rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducements or promises. *Id.*; *State v. Sierra*, 11-161 (La. App. 5 Cir. 12/28/11), 83 So.3d 239, 248.

A determination of voluntariness is made on a case-by-case basis, depending on the totality of the facts and circumstances of each situation. *State v. Gross*, 12-73 (La. App. 5 Cir. 2/21/13), 110 So.3d 1173, 1185, *writ denied*, 13-661 (La. 10/25/13), 124 So.3d 1091. The admissibility of a confession or statement is a determination for the trial judge, and the judge's conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. *Id.* Testimony of the interviewing police officer alone may be sufficient proof that a defendant's statements were freely and voluntarily given. *State v. Estes*, 14-781 (La. App. 5 Cir. 2/25/15), 168 So.3d 847, 860, *writ denied*, 15-654 (La. 2/5/16), 186 So.3d 1164.

In determining whether the trial court's ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the suppression hearing but may also consider the evidence presented at trial. *Berroa-Reyes*, 109 So.3d at 495. In our review, we have considered the testimony from both the suppression hearing and trial.

Defendant provided four statements—one at the apartment and three at the police station. We first address defendant's statements at the apartment. Sergeant Alvarez testified that he went to the apartment on Lafayette Street and attempted to communicate with defendant, but he seemed to speak Spanish. Sergeant Alvarez testified that he contacted Detective Landry to bring Ms. Duran, a Spanish speaking secretary, to the apartment. He stated that given the "issues with the child at that point in time," timing was very important. Sergeant Alvarez stated that defendant told him that he laid Aaron on the bed and went to take a shower; he then heard a noise and a scream, so he got out of the shower and saw Aaron on the floor. Sergeant Alvarez indicated that at the time of that conversation, he had not spoken to anyone at the hospital and had no information indicating that it was not an accident. Defendant was not a suspect or under arrest at that time.

The Louisiana Supreme Court has held that "*Miranda* warnings are not a pre-requisite to admissibility of statements taken by officers during noncustodial, general, on-the-scene investigations, conducted to determine the facts and circumstances surrounding a possible crime, *absent a showing that the investigation has passed the investigatory stage and has focused on the accused.*" *Estes*, 168 So.3d at 860 (citing *State v. Weeks*, 345 So.2d 26, 28 (La. 1977) (emphasis as found in original)).

In *Weeks*, 345 So.2d at 28, officers arrived at the scene of a shooting and had only been informed that a killing had occurred. The officers inquired as to whether anyone knew what happened, and the defendant relayed that she was present with

the victim when he was killed. The defendant offered other statements in response to general investigatory questioning and sometimes offered spontaneous statements. *Id.* The court concluded that the investigation did not begin to focus on the defendant as a possible offender until she provided those statements, and at that time the officers were not compelled to advise her of her *Miranda* rights. *Weeks*, 345 So.3d at 28.

Similarly, in *Estes*, 168 So.3d at 859, a deputy arrived on the scene with limited information that someone had been shot. He inquired as to what happened, to which the defendant said, "I did it." While the deputy placed the defendant in his patrol car, he testified that the questions he asked the defendant during that time period were to secure the scene and for clarification as he was unsure if there was another shooter or victim involved. *Id.* This Court found that the questions of where the firearm was located and the question of what happened were clarification questions following up on the voluntary statement previously made and were general, on-the-scene investigatory questions to determine the circumstances surrounding the possible crime. This Court concluded that the *Miranda* rights were not required prior to the defendant's statements to the deputy. *Estes*, 168 So.3d at 861.

In the present case, the record shows that any questions at the apartment were general, on-the-scene investigatory questions to determine the circumstances surrounding what was then believed to be an accident and that the investigation, at that time, did not focus on defendant. *See Estes*, *supra*; *Weeks*, *supra*. Accordingly, we find that *Miranda* rights were not required prior to any statements defendant made at the apartment.

Next, we address defendant's three statements at the police station. Defendant argues that he did not understand his *Miranda* rights because they were given to him in Spanish, not in his first language, Portuguese. However, the

testimony shows that defendant understood Spanish and could communicate with Ms. Duran. Sergeant Alvarez testified at the suppression hearing that it appeared defendant understood Ms. Duran. He also stated that defendant's translated responses made sense in connection with the questions he asked. At the hearing, Ms. Duran testified that when she arrived at the apartment, she noticed defendant had an "accent." She asked if he spoke Spanish, and he told her that he did. Ms. Duran also asked him how he communicated with Ms. Avila, with whom he was in a relationship and who speaks Spanish, and he replied that he speaks Spanish. Ms. Duran stated that she was able to communicate with and understand defendant. She indicated that she asked defendant several questions when they first met at the apartment to ascertain if they could understand each other in Spanish, and she found that they could.

The record also shows that defendant was presented with and understood his *Miranda* rights. Sergeant Alvarez testified that prior to speaking to defendant, he presented defendant with a Rights of Arrestee or Suspect form in English and read through the form while Ms. Duran translated it. He indicated that defendant initialed next to each right and appeared to understand them. Sergeant Alvarez stated that defendant signed the form agreeing to waive those rights, and defendant answered his questions. Sergeant Alvarez stated that he did not force, coerce, or threaten defendant at any time. The Rights of Arrestee or Suspect form, which was admitted into evidence, also reflects that defendant initialed each right, checked that he understood the rights read to him, and signed that he was waiving those rights. The form indicates that it was signed at 2:09 p.m. on July 31, 2018.

Ms. Duran testified at the suppression hearing that she met with defendant at the Gretna Police Department, and she translated defendant's *Miranda* rights on behalf of Sergeant Alvarez. She stated that she read him the rights from a Spanish

form and asked defendant if he understood each right after she read it. She indicated that she then had defendant initial next to each right if he understood it.

The first recorded statement indicates that defendant was presented with his rights immediately after being asked his name and age. The transcript indicates that the interview began at 2:08 p.m. on July 31, 2018. Sergeant Alvarez stated one right at a time, Ms. Duran translated it, and then Sergeant Alvarez asked if he understood that right. Sergeant Alvarez, with Ms. Duran translating, told him to put his initials by the right if he understood it. This process was repeated for each right and defendant indicated, either verbally or by nodding his head, that he understood the rights and agreed to speak to the officers. Defendant was then asked to sign the form if he understood what had been read to him and wanted to speak to the police and give a statement about what happened. Defendant answered affirmatively and then signed the form.

At the beginning of the second interview, Sergeant Alvarez asked if defendant remembered the rights previously read to him. Through Ms. Duran, defendant stated that he did. Sergeant Alvarez then asked if he understood them, and defendant replied yes.

Sergeant Alvarez began the third interview by again addressing defendant's rights. He asked defendant if he remembered the rights form that he signed, and defendant answered affirmatively. Sergeant Alvarez asked if it was okay to talk about the baby more and defendant said yes. Sergeant Alvarez then proceeded to question defendant further.

The trial court found that defendant was able to understand Spanish and communicate in Spanish, and that he understood his *Miranda* rights, which were presented in Spanish, and voluntarily chose to waive them. Based on the testimony and evidence, we find that the trial court did not err by denying defendant's motion to suppress statements. This assignment of error is without merit.

## ERRORS PATENT

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990).  Our review reveals no errors requiring corrective action.

## DECREE

For the foregoing reasons, we affirm defendant's conviction and sentence for second degree murder.

## AFFIRMED

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**JANUARY 27, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 20-KA-176

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE NANCY A. MILLER (DISTRICT JUDGE)
ANNE M. WALLIS (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          CYNTHIA K. MEYER (APPELLANT)

**MAILED**
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
LINDSAY L. TRUHE (APPELLEE)
LYNN SCHIFFMAN (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053